# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-1789 (SMB) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | Appeal No. 18-cv-07449 (PAE) |
| BERNARD L. MADOFF, | |
| Debtor. | |

## APPELLANTS' BRIEF

**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone and Fax: (888) 759-1114
Helen Davis Chaitman
Lance Gotthoffer
Gregory M. Dexter
hchaitman@chaitmanllp.com
lgotthoffer@chiatmanllp.com
gdexter@chaitmanllp.com

*Attorneys for Aaron Blecker and
Participating Claimants*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

STATEMENT OF ISSUES PRESENTED.......................................................................... 1

THE SIGNIFICANCE OF THE SIPA STATUTORY SCHEME ................................... 6

STATEMENT OF JURISDICTION................................................................................... 8

STANDARD OF REVIEW ................................................................................................ 8

STATEMENT OF THE CASE........................................................................................... 9

    I.    Factual Overview ................................................................................................. 9

        A.  The Blecker Accounts................................................................................ 9

        B.  Blecker consistently maintained that he never withdrew a penny ............................ 11

        C.  There was no documentary evidence that Blecker made a withdrawal .................... 12

        D.  The Trustee's own expert, Lisa Collura, could not reconcile the Blecker Accounts .............................................................................................. 15

        E.  The Trustee's expert, Matthew Greenblatt, created summary exhibits based on inadmissible hearsay and he did not reconcile Madoff's documents with any third-party documents ................................................. 17

        F.  Madoff's business practices were irregular ............................................. 19

        G.  The testimony of BLMIS employees proves that Blecker did not receive withdrawals ............................................................................... 19

    II.   Procedural history ............................................................................................. 22

    III.  The Decision below .......................................................................................... 23

SUMMARY OF ARGUMENT ......................................................................................... 29

    I.    The Bankruptcy Court had no power to eviscerate the FRE ............................ 29

    II.   The Trustee and the Bankruptcy Court relied upon inadmissible evidence .................... 29

    III.  Blecker did not ratify the PW transactions ...................................................... 30

    IV.  Blecker met his burden of proof ...................................................................... 31

ARGUMENT ................................................................................................................ 32

I.   The Orders must be reversed because of the Bankruptcy Court's
     evidentiary errors ........................................................................................... 32

     A.   The FRE applies in SIPA liquidations ...................................................... 32

     B.   It was legal error to hold that testimony relating to customers other
          than Blecker was relevant ........................................................................ 35

     C.   The business records exception was not applicable.................................... 37

          1.   The Bankruptcy Court's construction of the business records
               exception is reviewed *de novo* because the Bankruptcy Court failed
               to apply all of the elements of the business records exception ........... 37

          2.   The hearsay statements were made by unknown authors at
               unspecified times, and never by those with first-hand knowledge ...... 38

          3.   The Bankruptcy Court misapplied the hearsay exceptions................... 40

          4.   Madoff failed to maintain regular practices ........................................ 41

          5.   The Bankruptcy Court failed to consider that Participating
               Claimants showed that "the source of information or the method or
               circumstances of preparation indicate a lack of trustworthiness"......... 44

II.  The Bankruptcy Court erred in relying on *IMA* ............................................... 45

III. The Orders must be reversed because Blecker did not ratify the PW
     Entries ............................................................................................................ 48

     A.   It was legal error for the Bankruptcy Court to rely on 1992 contracts to
          hold that Blecker ratified pre-1992 PW transactions .................................. 48

     B.   The doctrine of ratification does not apply ................................................ 49

IV.  The Trustee is barred by the doctrine of *in pari delicto* from enforcing
     Madoff's contract against customers whom he defrauded ............................... 51

V.   It was clear error for the Bankruptcy Court to hold that it was Blecker's
     burden to establish that he had net equity greater than zero when the
     deposits were undisputed and there was no third-party evidence of any
     withdrawals ..................................................................................................... 53

CONCLUSION............................................................................................................ 53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Campbell v. Bd. of Ed.*,
   310 F. Supp. 94 (E.D.N.Y. 1970) ..........................................................................36

*Dafeng Hengwei Textile Co. v. Liu*,
   720 F. App'x 83 (2d Cir. 2018) ...............................................................................9

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)................................................................................................32

*Davoll v. Webb*,
   194 F.3d 1116 (10th Cir. 1999) ..............................................................................9

*Dickerson v. United States*,
   530 U.S. 428 (2000)................................................................................................32

*Ege v. Yukins*,
   380 F. Supp.2d 852 (E.D. Mich. 2005), *aff'd in part, rev'd in part*, 485 F. 3d
   364 (6th Cir. 2007)..................................................................................................36

*Freeman v. Marine Midland Bank-New York*,
   419 F. Supp.440 (E.D.N.Y. 1976) .........................................................................52

*In re Great E. Sec., Inc.*,
   2011 WL 1345152 (S.D.N.Y. Apr. 5, 2011)....................................................31, 49

*Green v. Bock Laundry Mach. Co.*,
   490 U.S. 504 (1989)................................................................................................33

*Hollander v. American Cyanamid Co.*,
   172 F.3d 192 (2d Cir. 1999)....................................................................................36

*In re Int'l Management Associates, LLC*,
   781 F.3d 1262 (11th Cir. 2015) ...................................................................... *passim*

*JPMorgan Chase Bank, N.A. v. Yuen*,
   2013 WL 2473013 (S.D.N.Y. June 3, 2013) ....................................................38, 39

*Karlen v. Freidman & Co.*,
   688 F.2d 1193 (8th Cir. 1981) ................................................................................50

*Lafleur v. MLB Indus., Inc.*,
   861 N.Y.S.2d 803 (2008)........................................................................................48

*In re Lavigne*,
    114 F.3d 379 (2d Cir. 1997)......................................................................................52

*Lee v. BSB Greenwich Mortg. Ltd. P'ship*,
    267 F.3d 172 (2d Cir. 2001)......................................................................................48

*LNC Invs. Inc. v. First Fid. Bank N.A.*,
    2000 WL 1072460 (S.D.N.Y. Aug. 3, 2000)............................................................35

*In re M & L Bus. Mach. Co., Inc.*,
    84 F.3d 1330 (10th Cir. 1996) ..................................................................................44

*In re Madoff*, (the "*Inter-Account Transfer Decision*")
    697 F. App'x 708 (2d Cir. 2017) ..............................................................................22

*In re Madoff*, (the "*Net Equity Decision*")
    654 F.3d 229 (2d Cir. 2011).............................................................................. *passim*

*Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*,
    936 F.2d 640 (2d Cir. 1991)........................................................................48, 49, 50

*Morton v. Mancari*,
    417 U.S. 535 (1974)..................................................................................................33

*In re MV Secs., Inc.*,
    48 B.R. 156 (Bankr. S.D.N.Y. 1985)........................................................................34

*Nadeau v. Equity Residential Props. Mgmt. Corp.*,
    251 F. Supp. 3d 637 (S.D.N.Y. 2017)......................................................................52

*Paddack v. Dave Christensen, Inc.*,
    745 F.2d 1254 (9th Cir. 1984) ..................................................................................30

*Palmer v. Hoffman*,
    318 U.S. 109 (1943)..................................................................................................44

*Parker v. Reda*,
    327 F.3d 211 (2d Cir. 2003)......................................................................................39

*People v. Collins*,
    438 P.2d 33 (Cal. 1968) ............................................................................................36

*People v. Risley*,
    214 N.Y. 75 (1915)...................................................................................................36

*Picard v. JPMorgan Chase*,
    721 F. 3d 54 (2d Cir. 2013)................................................................................26, 52

*Presser v. Key Food Stores Co-op, Inc.*,
   24 IER Cases 1596, 2006 WL 2086346 (E.D.N.Y. July 25, 2006) .........................................36

*Romano v. Howarth*,
   998 F.2d 101 (2d Cir. 1993)...............................................................................................39

*S.E.C. v. Sargent*,
   229 F.3d 68 (1st Cir. 2000)..................................................................................................9

*SEC v. F.O. Baroff Co.*,
   497 F.2d 280 (2d Cir. 1974).................................................................................10, 27, 53

*Tennessee Valley Auth. v. Hill*,
   437 U.S. 153 (1978)...........................................................................................................33

*Tome v. United States*,
   513 U.S. 150 (1995)...........................................................................................................33

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*,
   112 F. Supp. 3d 122 (S.D.N.Y. 2015).................................................................................35

*U.S. v. Blechman*,
   657 F.3d 1052 (10th Cir. 2011). .......................................................................................40

*United States v. Dreer*,
   740 F.2d 18 (11th Cir. 1984) .............................................................................................45

*United States v. Manning*,
   56 F.3d 1188 (9th Cir. 1995) ..............................................................................................9

*United States v. Owens*,
   789 F.2d 750 (9th Cir. 1986) ..............................................................................................9

*United States v. Ragghianti*,
   560 F.2d 1376 (9th Cir. 1977) ...........................................................................................32

*United States v. Robinson*,
   544 F.2d 110 (2d Cir. 1976)...............................................................................................41

*United States v. Salerno*,
   505 U.S. 317 (1992)................................................................................................8, 32, 37

*United States v. Shonubi*,
   103 F.3d 1085 (2d Cir. 1997).............................................................................................36

*United States v. Strother*,
   49 F.3d 869 (2d Cir. 1995).................................................................................................38

*United States v. Torniero*,
  735 F.2d 725 (2d Cir. 1984), *cert. denied,* 469 U.S. 1110 (1985)............................................35

*Wiand v. Lee*,
  753 F.3d 1194 (11th Cir. 2014) ...............................................................................................44

*Zervos v. Verizon New York, Inc.*,
  252 F.3d 163 (2d Cir. 2001)......................................................................................................33

**Statutes**

15 U.S.C. §§ 78aaa to -78lll............................................................................................... *passim*

15 U.S.C. § 78cc(b)...........................................................................................................................52

15 U.S.C. § 78eee(3)(A) .....................................................................................................................6

15 U.S.C. § 78fff-1(a)(4) ..................................................................................................................34

15 U.S.C. § 78fff-2(b).........................................................................................................................5

15 U.S.C. § 78fff-3 .............................................................................................................................7

15 U.S.C. § 78fff-3(a)..........................................................................................................................7

15 U.S.C. § 78fff-3(b)(2) .....................................................................................................................7

15 U.S.C. § 78lll(11)............................................................................................................................2

28 U.S.C. § 158(a)(1)..........................................................................................................................8

Exchange Act of 1934 Section 29(b) ...................................................................................31, 51, 52

**Federal Rules**

Fed. R. Bankr. P. 8002.......................................................................................................................8

Fed. R. Evid. 801..............................................................................................................................41

Fed. R. Evid. 801(d)(2).....................................................................................................................27

Fed. R. Evid. 803..................................................................................................................37, 39, 40

Fed. R. Evid. 803(6)................................................................................................................. *passim*

Fed. R. Evid. 803(6)(E)....................................................................................................................44

Fed. R. Evid. 803(7)....................................................................................................................40, 41

Fed. R. Evid. 804(b)(1) ...................................................................................................8, 37

Fed. R. Evid. 807 ..............................................................................................................46

Fed. R. Evid. 1006 ............................................................................................17, 24, 29, 30

Fed. R. Evid. 1101(a) ........................................................................................................32

## Other Authorities

H.R. Rep. 95-746 .................................................................................................................8

Law360.com, Baker Hostetler Closing on $1B Fee Mark for Madoff Case,
    available at
    https://www.law360.com/articles/1064606/print?section=assetmanagement
    (last accessed October 29, 2018) .................................................................................7

Markopoulos, *The World's Largest Hedge Fund is a Fraud*, available at
    https://www.sec.gov/news/studies/2009/oig-509/exhibit-0293.pdf (last
    accessed October 27, 2018) ......................................................................................50

U.S. Const. art. I..................................................................................................................32

Wright & Miller, Federal Practice & Procedure, § 6872 ...............................................41

Aaron Blecker ("Blecker") and Participating Claimants listed on Exhibit A to the Joint Notice of Appeal (collectively, with Blecker, "Participating Claimants"), ECF No. 17884-1 [AA437-AA444], submit this Brief in support of their appeal of the Bankruptcy Court's July 27, 2018 Memorandum Decision and Order Regarding Treatment of Profit Withdrawal Transactions, (the "Order"), ECF No. 17869 [AA383-428], and in support of Blecker's appeal of the Bankruptcy Court's August 3, 2018 Order Affirming the Trustee's Determinations Denying Claims and Overruling the Objections of Participating Claimant Aaron Blecker (the "Blecker Order"), ECF No. 17878 [AA429-30] .

## STATEMENT OF ISSUES PRESENTED

This appeal raises an issue of first impression regarding the enforceability of the Federal Rules of Evidence (the "FRE") in a SIPA liquidation, based upon the following facts.

Blecker recently died at the age of 107. He had held onto life for several years in the hope of recovering from the Estate of Bernard L. Madoff Investment Securities, LLC ("BLMIS") his net investment of $577,350.33. The Bankruptcy Court denied him that relief and he died shortly thereafter.

Blecker began investing through Bernard L. Madoff ("Madoff") in 1976. Madoff was an SEC-regulated broker-dealer who operated as a sole proprietorship from the early 1960s until January 2001 when he formed BLMIS. Blecker testified that he never took a penny out of Madoff/BLMIS. Blecker's son testified that, throughout his own life, his father told him he never took a penny out of Madoff/BLMIS and he urged his son not to either.

The Trustee of BLMIS was appointed by the Securities Investor Protection Corporation ("SIPC") to liquidate BLMIS pursuant to the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa to -78lll ("SIPA").  The Trustee has a statutory obligation to discharge claims of customers of the debtor up to the customer's "net equity."  SIPA § 78*lll(*11).  A customer's net equity is the amount the debtor-broker would have owed the customer if the customer decided to liquidate his account.  SIPA § 78*lll*(11).  Blecker's last statement from BLMIS indicated that he had an account balance of $2.63 million.  *See* PCX015 at 2.  However, in this liquidation, the Trustee has chosen to define a customer's net equity as deposits minus withdrawals over the life of the account, (the "Net Investment Method"), a position sustained by the Second Circuit based upon the Trustee's representation that Madoff/BLMIS never used investment advisory customers' funds to purchase securities and that Madoff's records were permeated with fraud.  *See In re Madoff*, 654 F.3d 229 (2d Cir. 2011) (the "*Net Equity Decision*").  The Trustee refused to calculate the customers' net equity based on the market value of the securities reflected on their last BLMIS customer statements, (the "Last Statement Method"), because "the Last Statement Method . . .  [has] the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations."  *Id*. at 235.  Based on the Trustee's representations concerning Madoff's books and records, the Second Circuit determined that "the BLMIS customer statements reflect impossible transactions" that are not "reflections of reality."  *Id*. at 242.

The Trustee admits that Blecker deposited $577,350.33 into his accounts and he admits that, after 1997, Blecker never withdrew any funds from his accounts.  However, the Trustee contends that Blecker received 180 separate "Profit Withdrawals" ("PWs") between 1981 and 1997, based solely upon ambiguous entries on Madoff's own records.  The PWs were indicated on the account statements sent to Blecker, not as cash

withdrawals, but simply with the designation "PW," and sometimes next to a stock symbol. There was no definition of "PW" on the statements and Blecker testified that he understood "PW" to mean that Madoff was purchasing the stock indicated next to the "PW" entry.

While the files of other customers contained third-party evidence of PWs, there is not a single piece of third-party documentary evidence indicating that Blecker ever received a check from Madoff. The Trustee's expert, Lisa Collura, testified that she was retained to reconcile PWs shown on customer statements with third-party records. Although she was able to verify transactions shown on the Madoff statements of other customers through third-party records, with respect to Blecker's accounts Collura testified that she was unable to reconcile a single PW. She found, for other customers, letters to Madoff requesting withdrawals, cancelled checks or check stubs showing the withdrawals, or bank records from the customers' accounts showing deposits of Madoff's checks (the "Third-Party Evidence"). However, with respect to Blecker, neither the Trustee nor Blecker had a single piece of Third-Party Evidence in the entire time period from 1976 through 2008. There is no letter in BLMIS' files of Blecker ever requesting or receiving a withdrawal; there are no cancelled checks, check stubs, or debit memoranda; there are no bank records corroborating a single withdrawal. And, if Blecker received 180 separate withdrawals from 1981-1997 – a time period when he was still working – it would have been completely inconsistent with the purpose of his Madoff accounts, which was to be a savings vehicle for retirement.

The only evidence before the Bankruptcy Court that Blecker had received PWs were the PW entries on the internally-generated records of Madoff which, as the Trustee has claimed were "permeated with fraud" and were intentionally designed to deceive

Madoff's customers.[1]  Indeed, the unreliability of Madoff's records was the basis of the Second Circuit's *Net Equity Decision*.  The Second Circuit relied upon  the Trustee's assertion that Madoff's records were "permeated with fraud," in holding  that Madoff's customers were not entitled to any appreciation over the life of their accounts, thereby saving SIPC over $2 billion in SIPC insurance that SIPC would have had to pay if SIPA was applied in accordance with its terms.

Madoff and his former employees testified that Madoff would not send a customer a withdrawal without receiving a written request from the customer.  Madoff retained such letters in each customer file, along with the check stubs of every check sent to a customer. There was no such letter in Blecker's file.  There were no check stubs in Blecker's file. There was not a single piece of Third-Party Evidence in Blecker's file.  Nevertheless, the Bankruptcy Court relied upon Madoff's internal records, "permeated with fraud," to conclude that Blecker had taken money out of his Madoff account prior to 1997.  In a holding of first impression, the Bankruptcy Court held that a SIPC trustee is not required to comply with the FRE and that Madoff records, permeated with fraud, can be used as the sole evidence of customer withdrawals.  The Bankruptcy Court's rationale was that the business records exception to the rule against hearsay, FRE 803(6), can be relaxed in a

---

[1] *See, e.g.* ECF No. 13876 at 5 (Trustee's Supp. Br., Aug. 12, 2016) [AA15] (discussing fraudulent and "fictitious" notations in the customer statements that "were irreconcilable with any trading records"); *id.* (warning against giving "undue credence to fictitious amounts engineered by Madoff"); *id.* at 6 [AA16] ("the securities transactions reflected on BLMIS books and records were fictitious"); *id.* at 63 [AA18] (discussing "the fraudulent nature of BLMIS's business . . . "); *see*  Declaration of Bruce G. Dubinsky, November 24, 2015, Ex. 1 at 157, ECF No. 12137-1, (Expert Report of Bruce G. Dubinsky) [AA9] ("[F]raud permeated BLMIS to the extent that the company's books and records could not be relied upon by a hypothetical buyer."); *id.* at 12 [AA9], 32 [AA11], 155 [AA12] ("Fraud permeated BLMIS.").

SIPA proceeding because the Trustee has a duty to discharge net equity obligations "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the Trustee."  SIPA § 78fff-2(b).  *See* Order at 4, 16 [AA386, AA398] (the "SIPA Exception to the FRE"). The Bankruptcy Court did not apply the elements of FRE 803(6), and, instead, simply relied on a completely distinguishable Eleventh Circuit case involving a financial fraud where the debtor's books and records were admitted because they had been corroborated by reliable third-party records, such as records subpoenaed from investors and financial institutions where the debtor had maintained accounts.  Here, as Collura testified, there was no Third-Party Evidence to confirm the veracity of Madoff's records.  Thus, the Bankruptcy Court had no authority to ignore a statutory command of Congress in refusing to apply the elements of FRE 803(6).

Based on these facts, this appeal raises the following issues:

- Whether the FRE do not apply in SIPA liquidations;

- Whether, despite the fact that (a)  there was no one who could attest to the reliability of Madoff-generated records to make them admissible under the hearsay exception in FRE  803(6); and (b) the Trustee's own expert claimed that Madoff's records were "permeated with fraud;" and (c) the Trustee's expert could not locate a single piece of Third-Party Evidence to substantiate the Trustee's allegation that Blecker withdrew funds from his Madoff accounts, the Bankruptcy Court could nevertheless admit Madoff's records into evidence and rely upon those records as the sole evidence supporting the Trustee's denial of Blecker's claim;

- Whether Blecker "ratified" the alleged PWs by failing to object to them within 10 days after receiving them, as purportedly required by customer agreements  that Blecker  signed in November 1992 (the "Customer Agreements"), and   whether any such ratification could apply to transactions that pre-dated the  Customer Agreements;

- Whether the Trustee, who stands in Madoff's shoes, is barred by the doctrine of *in pari delicto* from enforcing the Customer Agreements against the customers whom Madoff defrauded; and

- Whether the Bankruptcy Court erred in imposing the burden on Blecker to disprove all of the alleged PWs and whether, in fact, Blecker met that burden.

## THE SIGNIFICANCE OF THE SIPA STATUTORY SCHEME

The FRE were adopted by order of the Supreme Court on November 20, 1972; enacted by Congress in 1974, and signed into law by President Ford on January 2, 1975. In the 43 years since the FRE were adopted, no court has ever held that the FRE do not strictly apply in SIPA liquidations or that FRE 803(6) can be construed as the Bankruptcy Court did here. Despite the representation by the Trustee, through his expert, that Madoff's business records were "permeated with fraud," the Bankruptcy Court held that all of Madoff's internal records from the 1980s and 1990s can be used to prove withdrawals, to the penny, despite the denial by the alleged recipient of a single withdrawal, and despite the lack of a single piece of Third-Party Evidence. As the Trustee's own expert admitted, she was unable to reconcile a single alleged Blecker withdrawal with any Third-Party Evidence.

The Bankruptcy Court created a SIPA Exception to the FRE which has no basis in law. *See* Order at 4, 16 [AA386, AA398]. In the view of the Bankruptcy Court, a SIPA Trustee can rely upon the books and records of a massive fraudulent schemer. Such a relaxation of the protections of customers is totally insupportable in view of the following facts:

(1)    Under SIPA, SIPC appoints the Trustee. *See* SIPA § 78eee(3)(A).

(2)     Under SIPA, SIPC is responsible to fund an insurance fund so that customers of a broker who fails to purchase securities for their accounts are insured up to $500,000 per account.  SIPA § 78fff-3.

(3)     Under SIPA, the Trustee's fees and expenses are paid by SIPC.  *See* SIPA § 78fff-3(b)(2).

(4)      To date, the Trustee and his law firm have been allowed fees in excess of $1 billion.[2] And,

(5)     Blecker's claim of $577,350.33 could be settled for $500,000 – the amount for which SIPC is required under SIPA to insure each customer account.  SIPA § 78fff-3(a).

Thus, under SIPA the insurer appoints the trustee who determines how much the insurer must pay the customers.  Because SIPA was enacted as a remedial statute intended to protect customers whose brokers stole their money and never purchased the securities shown on their statements, the statute should be construed to protect victims of broker fraud.  For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
> * * *
>
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. **But because securities may have been lost, improperly**

---

[2] *See* Law360.com, Baker Hostetler Closing on $1B Fee Mark for Madoff Case, available at https://www.law360.com/articles/1064606/print?section=assetmanagement (last accessed October 29, 2018).

> **hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.**

H.R. Rep. 95-746 at 21 (emphasis added).

The Bankruptcy Court did not cite a single case supporting the proposition that the FRE do not apply in a SIPA liquidation. Surely, if Congress had intended to deprive customers of SEC-regulated broker-dealers the protections of the FRE, it would have so stated in SIPA. And, indeed, the Supreme Court has consistently reaffirmed the principle that federal courts "cannot alter evidentiary rules merely because litigants might prefer different rules in a particular class of cases." *United States v. Salerno*, 505 U.S. 317, 322 (1992). Thus, the decision below must be reversed.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1) because this appeal is from final orders of the Bankruptcy Court. The Order was entered on July 27, 2018 and the Blecker Order was entered on August 3, 2018. Participating Claimants and Blecker timely filed their Joint Notice of Appeal on August 10, 2018. [AA431]. *See* Fed. R. Bankr. P. 8002.

## STANDARD OF REVIEW

The Bankruptcy Court's holding that the FRE do not apply in a SIPA liquidation is a determination of law subject to *de novo* review. *See Net Equity Decision*, 654 F.3d at 234 (bankruptcy court's "interpretation of SIPA" is a legal conclusion reviewed *de novo*). Similarly, the Bankruptcy Court's misinterpretation of the FRE is an error of law reviewed *de novo*. *See United States v. Salerno*, 505 U.S. 317, 321 (1992) ("Nothing in the language of Rule 804(b)(1) suggests that a court may admit former testimony absent satisfaction of

each of the Rule's elements."). "On appeal from a judgment after a bench trial, we review the district court's finding[s] of fact for clear error and its conclusions of law *de novo*. Mixed questions of law and fact are also reviewed *de novo*.'" *Dafeng Hengwei Textile Co. v. Liu*, 720 F. App'x 83, 84 (2d Cir. 2018) (citations omitted); *United States v. Owens,* 789 F.2d 750, 757 (9th Cir. 1986) (construction of the rules of evidence is reviewed *de novo*); *S.E.C. v. Sargent,* 229 F.3d 68, 79 (1st Cir. 2000) (same); *United States v. Manning*, 56 F.3d 1188, 1196 (9th Cir. 1995); *Davoll v. Webb*, 194 F.3d 1116, 1136 (10th Cir. 1999) ("We review de novo a district court's interpretation of the [FRE]");.

## STATEMENT OF THE CASE

### I.   Factual Overview

#### A.   The Blecker Accounts

The Trustee has admitted that Blecker and his deceased wife, Sofie Blecker, deposited $577,350.33 into their Madoff accounts beginning in 1976. *See* PCX023 at 3; PCX017 at 4.[3]  The Bleckers had at least nine different accounts with BLMIS, and those accounts changed numbers numerous times (the "Blecker Accounts").  When Madoff confessed, Sofie Blecker had died and Blecker had consolidated the accounts so that he had only one account, which had a balance of $2.63 million. *See* PCX015 at 2. Upon the collapse of BLMIS, Blecker made claims for his Net Equity in the Blecker Accounts (the "Blecker Claims").

By filing his SIPC claims, Blecker established his *prima facie* case and he is entitled to have his net equity claim honored in the amount of $577,350.33 under the Net Investment Method unless the Trustee can prove that he took withdrawals from the Blecker

---

[3] Although the Bleckers had at least one of the Madoff Accounts since at least 1976, the Trustee accepts the balances of all Madoff Accounts as of 1981. *See* Order at 26 [AA408].

Accounts.  *See SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 (2d Cir. 1974) (claimant bears

the initial burden of establishing that he is a customer and has a claim against the customer

property pool); *Net Equity Decision*, 654 F.3d at 236 (customer status is established simply

by showing that the claimant deposited cash with a broker for the purpose of purchasing

securities).  The Bankruptcy Court held that the Blecker Accounts had a negative net equity

because the Bleckers allegedly received 180 PWs from 1981 – 1997.

Six years after denying the Blecker Claims and after two years of discovery, the

Trustee disclosed in his trial brief that the Bleckers had only **four** accounts with Madoff.

ECF No. 13876 at 36 (Trustee's Aug. 12, 2016 Br.)  [AA17].  At trial, however, Blecker

proved that the Bleckers had at least **nine** accounts:

| 1-00254-1-0 | 1/19/18 Trial Transcript ("Tr.")[4] at 108:5-18, 124:22-125:9. |
|---|---|
| 1-00254-9-0 | Tr. at 131:7-21. |
| 1-00214-1-8 | Tr. at 203:4-21. |
| 1-00215-1-0 | Tr. at 122:10-123:25. |
| 1-00215-9-0 | Tr. at 124:13-16, 137:21-24. |
| 1-B0156-30 | PCX022 at 1 |
| 1-B0157-30 | PCX022 at 1; PCX020 at 4. |
| 1-B0022 | PCX022 at 1; PCX020 at 4; PCX017 at 1. |
| 1-B0023 | PCX021 at 4. |

Blecker did not have a complete set of the statements for the Blecker Accounts,

going back 42 years.  Tr. 55:7-10.  And although the Trustee made various productions of

documents which included some of the Bleckers' account statements, the Trustee never

supplied any document that would provide an entire history of the Bleckers' various

accounts from 1981 on.  *See* Declaration of Helen Davis Chaitman, ECF No. 17398-1

[AA315-19].  Nor did the Trustee provide a document supplying Bates numbers cataloging

---

[4] AA25-314.

all of the Bleckers' account statements, showing the corresponding dates.  Indeed, again, in his trial brief, the Trustee represented that there were only four Blecker accounts. [AA17].  Thus, it is impossible to ascertain whether complete records exist or have been produced and Greenblatt's glib testimony could not overcome these deficiencies.  Perhaps there was an arrangement whereby, if any of the PW checks were, in fact, issued, they were deposited into another Blecker account established to hold the PW checks.  Blecker was 97 when Madoff confessed.  He could not possibly remember conversations he may have had with Madoff in 1981.  Without the cancelled checks, and without a complete production of all the Blecker account statements, it is impossible to know what happened.

### B.  Blecker consistently maintained that he never withdrew a penny

Blecker consistently stated, under oath, that he and his wife never withdrew a penny from the Blecker Accounts.  PCX015 at 5; PXC016 at 5; PCX018 at 1; PCX019 at 1; PCX022 at 1; Blecker Tr. at 6:9-7:21, 8:24-9:8, 11:3-16; PCX068; *see also* Tr. 38:16-25, 39:14-21, 40:21-41:1, 43:5-9, 47:11-18.[5]  Blecker testified that he never received a withdrawal check and he never asked for a withdrawal.  *Id.* at 6:9-7:21, 8:24-9:8, 11:3-16, 12:16-25.  Blecker testified that he did not take withdrawals because his Madoff accounts were for his retirement and he had anticipated that they would be available for his grandchildren's college education.  *Id*. at 6:9-7:21, 8:24-9:8, 11:3-16, 12:16-25.  Sofie never withdrew any funds from the Blecker Accounts.  *Id*. at 9:18-10:4.  Blecker further testified that, if he had taken withdrawals, he would not have requested to receive checks

---

[5] The Trustee deposed Blecker on July 1, 2014.  Tr. at 14:2-10.  His deposition testimony was admitted into evidence at trial because, at that time, Blecker was 107 years old and his doctor felt it would be life threatening for him to testify.  Tr. at 14:12-15:4.

in uneven amounts such as those that that Trustee asserts constitute PWs.  *Id.* at 11:17-12:7.  Blecker's testimony is unimpeached.

Blecker's son, Robert Blecker ("Robert"), a professor of legal ethics, testified that, throughout his life, his father consistently told him that he never took a single withdrawal from any of the Blecker Accounts.  Tr. at 29:20-30:16, 35:18-25,  36:12-37:9, 41:2-17. Robert testified that one of the few times, in his life, that he ever argued with his father, was when Robert wanted to withdraw funds from his own Madoff account.  Blecker told Robert that he had never withdrawn funds from Madoff and Robert should not do so either. Tr. at 35:18-36:4, 36:12-37:9, 41:2-17.  After Madoff confessed, Blecker told Robert that Robert was right; he should have taken money out over the years.  Tr. at 41:2-42:7; *see id.* at 42:4-5. Robert's testimony was unimpeached.

### C.  There was no documentary evidence that Blecker made a withdrawal

Madoff testified that it was always his business practice to require written requests from customers if they wanted to receive withdrawals.  Madoff Tr. at 9:12-10:5, 10:8-20, 11:3-11:9, 13:16-23, 34:15-20, 35:9-15, 108:16-20; *see also* Tr. at 54:2-11.   Former BLMIS employees corroborated this testimony and explained that it was Madoff's practice to retain such written requests in the customers' files.  Bongiorno Tr. at 210:1-16; *id.* at 256:9-257:15 (customers had to send written request to change "Reinvest" to "Send" account); *see also id.* at 40:1-4 (indicating that requests for capital withdrawals "absolutely" had to be in writing); Jackson Tr. at 112:24-114:1 (unequivocally testifying that all requests for PWs had to be in writing);  Sala Tr. at 235:23-236:10, 237:20-238:1.

The Bleckers' customer file did not contain a single written request for PWs or any other withdrawals in the entire period from 1976-2008.  Similarly, the Bleckers' customer file did not contain a letter requesting the termination of withdrawals in 1997 when Madoff

stopped indicating "PW" on the Blecker monthly account statements, even though Bongiorno testified that such a letter would have been required. Bongiorno Tr. at 40:1-4, 256:9-257:15. While the Trustee has written requests from other customers requesting PWs, *see, e.g.*, PCX050, PCX060, he has none from the Bleckers. Winifer Jackson, one of the former BLMIS employees, admitted that the only reliable information in Madoff's files were letters from customers, and this would be the only way to determine whether a customer received a PW. Jackson Tr. at 107:21-7, 109:9-13, 112:24-114:1.

Bongiorno testified that Madoff's checks contained a bottom section, separated from the check by a serrated edge, and it was Madoff's business practice to maintain that bottom half in the customers' files, along with a copy of each check ever sent to a customer. Bongiorno Tr. at 42:4-20, 76:24-79:19, 214:20-217:6; *see* Order at 14 [AA396]. Bongiorno testified that Madoff retained everything he sent to customers, including "confirmations, memos, statements," and any evidence of checks. Bongiorno Tr. at 42:4-20, 76:24-79:19, 214:20-217:6. Bongiorno was unequivocal that, "if a profit withdrawal check was sent to a customer," Madoff "would still have a copy of it." *Id.* at 217:1-6. Yet, the Trustee does not have a single check stub, memo, or confirmation indicating that a check was ever sent to the Bleckers.

Robert assisted his father in producing all of his records to the Trustee. Robert testified that he searched his father's records assiduously and was instructed by Blecker's counsel that Blecker had to turn over all records. Tr. at 36:12-37:1. In reviewing his father's records, Robert did not find a single check voucher indicating that his father had received a check from Madoff. Tr. at 35:8-17, 36:12-37:9; *see also* PCX048 (example of a check voucher to a Madoff customer). Robert found no evidence in his father's records

that his father ever received a check from Madoff.  *See* Tr. at 36:12-37:9.  And he testified that, if his father had received any checks from Madoff, his father would have retained the voucher.  Tr. at 35:8-17, 36:12-37:9.

While Bongiorno testified that a letter requesting PWs was required except at the time of the account opening, Madoff testified that such a letter was always required. Madoff Tr. at 9:12-10:5, 10:8-20, 11:3-11:9, 13:16-23, 34:15-20, 35:9-15, 108:16-20. Bongiorno acknowledged that all account openings were handled solely by Madoff, who spoke personally to each new customer.  Bongiorno Tr. at 193:2-7, 195:14-18; Madoff Tr. at 9:12-10:5, 10:8-20, 11:3-11:9, 13:16-23,34:15-20, 35:9-15, 108:16-20.  She admitted that only Madoff could open an account and she was not privy to Madoff's communications with new account holders.  *Id*. at 195:14-18.

According to Bongiorno, an account could receive PWs automatically if it was designated a "Send" account on Madoff's internal records.  If an account was a "Send" account, some BLMIS employee, based on instructions from Madoff, would write "S" on some unnamed form that was "just a piece of ledger paper."  Bongiorno Tr. at 35:18-36:19. If an account was a "Reinvest" account, it would not receive PWs automatically and the piece of ledger paper would be marked "R" rather than "S."  *Id*.  Bongiorno testified that a customer would be required to send a written request to change a "Send" account to a "Reinvest" account, and *vice versa.  Id*. at 40:1-4, 256:9-257:15.  Although the Trustee alleges that Blecker stopped receiving PWs in 1997, the Trustee has no letter from Blecker requesting that his account be changed from an "S" account to an "R" account.  *See, e.g.*, Tr. at 217:2-8, 226:6-9.

Bongiorno explained that, in 1997, when Madoff switched from arbitrage trading to the split-strike conversion trading, customers who had requested PWs were automatically switched to quarterly profit distributions.  Bongiorno Tr. at 227:21-229:4. Thus, if Blecker had been receiving PWs, he automatically would have begun receiving quarterly profit distributions.  Bongiorno testified that Blecker's account 1B022 became an options account in April 1996, but it was never changed from a "Send" to a "Reinvest" account.  *Id*. at 89:19-90:10.  But, in fact, as the Trustee admits, after 1997 Blecker never received a distribution from Madoff/BLMIS and there is nothing in the Bleckers' files to even remotely suggest that the Bleckers ever wrote to Madoff stating that they did not want to receive quarterly profit distributions.

### D. The Trustee's own expert, Lisa Collura, could not reconcile the Blecker Accounts

The Trustee's expert, Lisa Collura, a forensic accountant at FTI Consulting ("FTI"), was retained to determine whether she could "reconcile" cash transactions, including PW entries, reflected on the Madoff customer statements.  *See* Tr. at 68:8-23.  Collura explained that, in order to reconcile PW transactions, she had to look at Third-Party Evidence such as: (a) customer bank records showing the deposit of Madoff checks into customers' accounts or Madoff cancelled checks proving the checks were deposited by the payee;  (b) letters from customers requesting withdrawals and other third-party documentation contained in BLMIS customer files; and (c) records obtained by the Trustee, which include third-party records and records produced by customers.  PCX08 at 5, ¶ 11; Tr. at 68:8-23, 69:17-70:1, 71:11-17, 76:14-20, 91:18-92:6.  If such records do not corroborate the PW entries on BLMIS statements, then those PW transactions cannot be "reconciled."  *See generally* PCX08.

Collura explained that she was able to reconcile only 51,769 of the 91,132 total PW transactions found in all of the BLMIS records.  Tr. at 103:6-19; PCX08, ¶ 11.  However, the vast majority of the transactions that she could reconcile occurred in the ten-year period between December 1998 and December 2008 (the "Ten-Year Period"), during which Madoff was not doing arbitrage trading.  Instead, during the Ten-Year Period, Madoff was doing a "split strike conversion" strategy which did not generate "PW" entries on the customer statements.  Collura was able to reconcile cash withdrawals shown on customer statements during the Ten-Year Period by looking at customer bank statements and other third-party records.  *See* Order at 15 [AA397].  With respect to the period prior to the Ten-Year Period, the only period applicable to Blecker and the only period in which PW entries appeared, Collura was able to reconcile only 54% of the PWs and, of that 54%, the majority were transactions of Madoff co-conspirator,  Norman Levy.  *See* Order at 15 [AA397]; Tr. at 148:6-150:16; Collura Report, July 14, 2015, ECF No. 10664 at 13 [ECF p. 15], n. 10.

Collura was unable to confirm a single withdrawal from the Blecker Accounts.  Tr. at 107:14-16.  She admitted that there was not a single piece of documentary evidence supporting the Trustee's contention that the Bleckers took out PWs from 1981-1997.  PCX08 at 9, Attachments D17 and D18; Tr. at 107:14-16.  There is not a single letter regarding PWs in the Bleckers' file; there is not a single bank record to reconcile any of the Bleckers' alleged PWs; and there is not a single record obtained by the Trustee or in Blecker's possession that could reconcile any alleged PW in the Bleckers Accounts.  Tr. at 107:14-108:2, 114:16-21, 117:14-17, 117:1-9, 119:6-19; 120:2-6.

Thus, although Collura was able to offer testimony about her efforts to reconcile accounts *other than Blecker's*, during time periods *other than* those in which the Bleckers

were alleged to have received PWs (and during which Madoff employed a *different* trading strategy), those results are irrelevant and she could not reconcile a single alleged Blecker withdrawal.

**E. The Trustee's expert, Matthew Greenblatt, created summary exhibits based on inadmissible hearsay and he did not reconcile Madoff's documents with any third-party documents**

Matthew Greenblatt, also a forensic accountant at FTI, was tasked with preparing summary exhibits for each BLMIS account, listing all of the deposits and withdrawals over the life of the accounts (the "Principal Balance Calculations"). *See* Order at 8 [AA390]; *see* TX086, TX091, TX092, and TX093. The Principal Balance Calculations assume what they set out to conclude: that is, if a customer statement lists a PW, then that customer received a check from Madoff in the amount next to the PW entry. *See, e.g.*, TX086. The Principal Balance Calculations were admitted, over Blecker's objection, under FRE 1006.

Although Collura testified that she could not reconcile withdrawals without third-party documents, in creating the Principal Balance Calculations, Greenblatt did not review any third-party documents. He simply reviewed Madoff's internal records from 1982 – 1997. Order at 8 [AA390]; Tr. at 168:23-169:8; Order at 8-9 [AA390-391]. Based on his review of Madoff's documents, primarily customer statements, Greenblatt opined that the Bleckers received 180 separate PWs between 1981 and 1997. *See* Tr. at 167:16-168:10; TX086; TX091; TX092; and TX093. While Greenblatt claimed he reviewed all of the Bleckers' monthly statements from their inception and that there were no gaps in those records, **the Trustee never introduced into evidence a complete set of such records and or even an index accounting for all nine Blecker Accounts. [AA315-19].** Moreover, Greenblatt admitted that some of Bleckers' statements were illegible. *See id.* ¶¶ 11-14, 16 [AA317-18]; *see also id.*, Exs. M-P [AA375-82]; Tr. at 200:25-201:21.

Greenblatt, of course, admitted that he never saw a letter from Blecker requesting PWs for any period of time, and he never saw a check written to Blecker.  Tr. at 216:13-217:12, 219:16-19.  Greenblatt admitted that, without seeing the back of a cancelled check (or having a customer's personal bank records), he would have no way of knowing whether a PW check was deposited by the payee.  Tr. at 228:19-21; *accord* Tr. at 105:3-11, 153:24-154:12 (Collura).  In fact, the Trustee's professionals admitted they found conclusive evidence that 800 PW notations represented checks to customers that were not cashed.  Tr. at 231:7-232:8. Thus, even if a PW represented a withdrawal, there is no basis to conclude that the withdrawal was received by the payee on the check.  Tr. at 228:19-21.

Greenblatt admitted that the Bleckers did not withdraw a penny after 1997.  Tr. at 226:6-9.  He admitted that there was no letter from Blecker asking Madoff to stop sending him PWs, even though the Trustee admits that Blecker never took a withdrawal after 1997. *See* Tr. at 217:2-8.  Greenblatt offered no explanation for this.

Greenblatt testified that he understood, based only on his reading of the depositions of BLMIS employees, that if an account opening form had an "S," this meant that it was a "Send" account.  Tr. at 218:12-24.  Of course, Greenblatt had no knowledge as to who wrote the "S" with respect to any of the Blecker Accounts, or other customer accounts, under what circumstances the "S" was written, or on what date.  Tr. at 218:25-219:15. Greenblatt never interviewed a single BLMIS employee to the extent "forensic account[ant]s normally do," and instead only asked them "procedural questions," such as where files were maintained.  Tr. at 227:22-228:8.

Greenblatt admitted that gaps existed in Madoff's records.  He relied on Portfolio Management Reports ("PMRs"), Portfolio Management Transaction Reports ("PMTs"),

and Spiral-bound notebooks (the "Spiral Notebooks"). He admitted that he did not have complete records for any of these documents. Tr. at 196:15-197:11. Yet, in the case of the Bleckers, Greenblatt claimed – without introduction of the Blecker statements – that the Trustee had a complete set of Blecker's monthly statements. Tr. at 225:9-15. Given the gross limitations in Greenblatt's methodology and given his reliance solely on documents that were "permeated with fraud," it was error for the Bankruptcy Court to rely upon his testimony.

### F. Madoff's business practices were irregular

Bongiorno testified that Madoff/BLMIS had a "different story" every five to ten years. Bongiorno Tr. at 15:7-20. For instance, during one unidentified period Madoff decided to make all new accounts "Send" accounts. Bongiorno Tr. at 35:1-9. Bongiorno testified that accounts could be designated as "Send" accounts even without the customer requesting it. Bongiorno Tr. at 160:8-10 ("[An 'S' would mean] I guess she – they wanted their check or Bernie wanted to send them a check. I don't know. Whatever."). Jackson testified that employees gave Madoff PW checks directly on occasion, trusting Madoff to give the checks to the client personally. Jackson Tr. at 110:19-111:14.

### G. The testimony of BLMIS employees proves that Blecker did not receive withdrawals

Madoff employees recorded in the Spiral Notebooks checks that were written to each customer representing PWs. *See, e.g.*, Order at 13-14 [AA395-6]. The Spiral Notebooks were kept in the office of Madoff's co-conspirator Jodi Crupi and any BLMIS employee could access and manipulate these notebooks and the PW notations contained therein at any time. Sala Tr. 193:10-193:16 ("[A]nybody could go – everybody knew where it was to go and put a check in there."). Yet, of the 180 PW checks that the Trustee

claims the Bleckers received, only four are listed in the Spiral Notebooks. *See* TX190; TX229. Ignoring Sala's testimony, the Bankruptcy Court held that the Spiral Notebooks were "mostly used for checks that had to be issued manually, such as when customers called BLMIS because they had not received PW checks they were expecting." Order at 14 [AA396]. This holding was inconsistent with Bongiorno's testimony. *See, e.g.*, Bongiorno Tr. at 240:3-6 (the Spiral Notebooks were used to record transactions in the arbitrage accounts). And it provides further evidence of the irregularity and unreliability of Madoff's record-keeping practices.

None of the Madoff employees had any personal knowledge as to whether Blecker ever received a PW check. Sala testified that she had no basis for believing that Blecker would have received PWs other than the fact that some person she could not identify  had inserted "S" on a form in Blecker's file, indicating that at least one of his accounts was marked a "Send" account at some undesignated time. Sala Tr. at 249:19-21 ("I just assume that because it was a send account" but Sala had no idea who put the "S" on that form and, in fact, she did not even recognize the initials of the person, written next to the "S."); *id*. at 250:22-251:24. Sala admitted that she never confirmed with customers whether they received a PW check and that she really had no idea at all whether customers ever received PW checks. *Id*. at 239:16-24-243:4, 261:4-12. Sala confirmed that customers were required to request withdrawals in writing and that such written requests were maintained in the customer files. *Id*. at 235:23-236:10; 237:20-238:1; *accord* Bongiorno Tr. at 210:1-16.

Jackson had no idea whether any customer ever received a PW check. Jackson Tr. at 109:25-112:23, 114:2-14, 117:5-8, 119:8-14. Bongiorno admitted that neither she, nor

anyone she knew, ever confirmed with customers if they received their PW checks. *Id.* at 197:12-201:3.

With the exception of Bongiorno, none of the Madoff employees knew much about Madoff's operations. For example, Dorothy Kahn testified: "There's no way for me to know anything. Nobody ever explained to me what we do. All we know, we got work and we did the work. I don't know the detail of the work." Kahn Tr. at 98:25-99:4. Kahn testified: "I didn't understand anything. All I know, I just entered and printed. I don't know the details of anything." *Id*. at 100:1-5. Alethea Leung, another BLMIS employee, had no knowledge as to whether any customer ever received a PW check. Leung Tr. at 134:13-16, 136:16-137:2, 143:5-15, 151:18-152:17. Leung testified that she did not even know what a "profit withdrawal" was or whether an "S" meant an account was a "Send" account. Leung Tr. at 135:2-8, 142:18-143:4.

The Madoff employees consistently testified that the only reliable evidence was third-party evidence and that Madoff's internal records were unreliable. Sala admitted that the only reliable documents were those sent **from** customers, and she had no idea whether any of the Madoff-generated documents were accurate or not. *See* Sala Tr. at 243:0-244:16, 252:22-254:6. Jackson testified that the only reliable evidence was a letter from a customer requesting a PW and that Madoff required such requests to be in writing. Jackson Tr. at 112:24-113:8. Leung also had no confidence in the accuracy of any of Madoff's records: "They gave me information I guess that's false. I don't know, you know, what they did with it. But I guess now that I know it was a whole Ponzi scheme, everything was false, yeah." Leung Tr. at 132:19-24. Yet, the Bankruptcy Court relied upon these very same records when the Trustee's expert opined that they were "permeated with fraud."

## II.    **Procedural history**

The Blecker Claims were timely filed in July 2009.  *See* PCX15; PCX16; PCX61.
The Trustee denied the Blecker Claims in October 2009 on the basis that withdrawals
allegedly exceeded deposits.  *See* PCX17; PCX20; and PCX21.  The Trustee has never
claimed that Blecker took a withdrawal after 1997.  The *only* withdrawals that the Trustee
alleges to have occurred in the Blecker Accounts were the 180 separate PWs that pre-date
1998.  *See* PCX17; PCX20; and PCX21.  Blecker timely filed objections to the Trustee's
determinations.

During an omnibus proceeding regarding the Trustee's inter-account transfer
methodology for computing net equity, which was ultimately resolved by the Second
Circuit,[6] Blecker argued that he never received PWs and they should not reduce his net
equity.  ECF No. 6719.  The Trustee responded that "if there is a *factual issue* . . . it should
be determined pursuant to a separate proceeding.  To the extent that Blecker is objecting
to the Trustee's determination regarding whether *the particular transactions in his
accounts should be treated as withdrawals*, this question does not affect whether the
Trustee's [inter-account] transfer *methodology* is correct."  ECF No. 6926 at 7 (emphasis
added).  Thus, this proceeding was carved out of the inter-account omnibus proceeding to
resolve the *factual* issue of whether Blecker and other Participating Claimants ever
received the particular PW checks with which the Trustee has charged their accounts.

In February 2015, the Trustee filed a Motion for a PW omnibus proceeding, ECF
No. 9357, which was amended in May 2015.  This proceeding was established by Order of
the Bankruptcy Court and was limited to customers who have not been sued by the Trustee

---

[6] *See In re Madoff*, 697 F. App'x 708 (2d Cir. 2017) (the "*Inter-Account Transfer
Decision*").

to void alleged fraudulent transfers.  ECF No. 10266.  Accordingly, the Trustee's determination is unchallenged as to the treatment of PW entries in the accounts of those non-clawback customers who have not opted into this proceeding.

On January 19, 2018, the Bankruptcy Court conducted an evidentiary hearing to "resolve the issues related to the Trustee's treatment of PW Transactions."  Order at 6 [AA388].  At that hearing, the Bankruptcy Court also heard Blecker's objection to the Trustee's determination of the Blecker Claims.  *See* Order at 3 [AA395].

### III.   **The Decision below**

The Bankruptcy Court entered the Order on July 27, 2018.  The Order holds "that a PW notation appearing in a monthly statement supports the finding, in the absence of credible contrary evidence offered by a claimant in that claimant's case, that the customer received a cash distribution in the amount indicated."  Order at 2 [AA384].  With respect to Blecker specifically, the Order holds that "Blecker has waived any objection to the treatment of PW Transactions in the Blecker Accounts as cash withdrawals, and additionally, has failed to sustain his burden of proving the amount of his Blecker Claims." *Id*. at 3 [AA385].  Thus, the Order holds that Blecker "ratified" the PWs and sustained the Trustee's determination of the Blecker Claims at zero.  *Id*.

In holding  that the Trustee is entitled to a presumption that a PW notation on a Madoff statement dated from 1981 – 1997 represents a check sent to the customer, the Bankruptcy Court relied on the testimony of Collura and Greenblatt.  The Bankruptcy Court relied on Collura even though she could not reconcile the PW entries on the Bleckers' statements with any Third-Party Evidence.  Inexplicably, the Bankruptcy Court relied on the fact that Collura was able to reconcile transactions in accounts of customers *other than Blecker*, during the last ten years of Madoff's operation, when third-party records were

available and a time period during which Madoff's trading strategy did not involve PWs. Order at 22 [AA404] ("[T]he 'other customer' records relied on by the experts tends to make it more probable that PW Transactions represented cash withdrawals in any individual customer case."). The Bankruptcy Court relied on Greenblatt's Principal Balance Calculations, even though they were derived solely from Madoff's internal records which the Trustee's own expert opined were "permeated with fraud."

Moreover, the Bankruptcy Court permitted Greenblatt to testify as to his alleged review of all of the Blecker account statements despite the fact that, in his trial brief, the Trustee admitted to only four Blecker accounts whereas, in fact, Blecker put into evidence documents reflecting he and his wife had at least nine accounts.

In overruling Blecker's objection to the admissibility of Madoff's internal records in the absence of any third-party corroborating records, the Bankruptcy Court held that it had authority to relax the rules against hearsay because "[t]he Trustee's statutory obligation is to discharge net equity claims of customers of the debtor 'insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the Trustee.'" Order at 4 [AA386] (quoting SIPA § 78fff-2(b)); *see also* Order at 16 [AA398] ("In ruling on the objections, it is necessary to bear in mind that a SIPA trustee must make payments to customers based on their net equity 'insofar as the amount owed to the customer is 'ascertainable from the books and records of the debtor . . .'") (citation omitted). The Bankruptcy Court even admitted into evidence the Principal Balance calculations under Rule 1006, determining that the mass of underlying Madoff documents were admissible under the business records exception – again despite the Trustee's own expert's admission that those business records were "permeated with fraud"

and the consistent testimony of Madoff's former employees that they could not verify anything in the internal records.[7]

The Bankruptcy Court did not apply the elements of the business records exception to admit Madoff's business records. Instead, it simply relied on *In re International Management Associates, LLC*, 781 F.3d 1262 (11th Cir. 2015) ("*IMA*"), holding that "the BLMIS records offered by the Trustee, particularly the customer statements, are excepted from hearsay . . . for the reasons explained by the Eleventh Circuit in *Int'l Mgmt.*" Order at 25 [AA407]. Reliance on *IMA* is utterly misplaced, as explained *infra* at Section II of the Argument, because the summary exhibits in *IMA* were based on reliable third-party evidence. Here, of course, Greenblatt's Principal Balance Calculations were not supported by any third-party evidence; they were only based upon Madoff's internal records which were "permeated with fraud" and designed to be deliberately misleading.

To take just a few examples of the Bankruptcy Court's errors, it did not even consider how the Trustee could meet his *prima facie* burden to establish the elements of the business records exception when the Trustee had relied upon his own expert's opinion that Madoff's records were "permeated with fraud" and whether, if that burden was met, Blecker rebutted it. *See* Order at 23-26 [AA405-8]; FRE 803(6) (business records not admissible if the opponent "show[s] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness"). The Bankruptcy Court held that Blecker ratified the PW Transactions because two undated Customer Agreements between Blecker and Madoff, purportedly executed no earlier than November 1992, stated that "'[c]onfirmations of transactions and statements for the Customer Account(s) shall be

---

[7] Although SIPA was designed to protect customers, only the Trustee, not the customer, got a free pass on the FRE.

binding upon the Customer if the Customer does not object, in writing, within ten days after the receipt by the Customer . . . .'"  Order at 31 [AA413] (quoting TX45, ¶ 16 and TX49, ¶ 16).

The Bankruptcy Court did not explain how documents signed in 1992 could retroactively ratify pre-1992 transactions.  *See* Order at 30-32 [AA412-14].  The Bankruptcy Court did not explain how the Trustee, standing in Madoff's shoes, could, under the doctrine of *in pari delicto*, enforce the Customer Agreements against customers whom Madoff had defrauded when the Trustee has no greater powers than a trustee in an ordinary bankruptcy case.  *Picard v. JPMorgan Chase,* 721 F. 3d 54 (2d Cir. 2013) ("[A] SIPA trustee is vested with the same powers and title with respect to the debtor and the property of the debtor . . . as a trustee in a case under Title 11.").  Finally, the Bankruptcy Court did not explain how the Trustee could rely on the 10-day clause in the Customer Agreements to hold that Blecker is bound by ambiguous PW notations in documents designed to mislead Blecker but the Trustee is not bound to honor the Trustee's and Madoff's obligations to honor Blecker's claim for the balance owed to him as set forth on the last statement he received.  *See id.*

The Bankruptcy Court held that, even if Blecker had not ratified the PW Transactions, Blecker failed to sustain his burden of proof.  *See* Order at 33-35 [AA415-17].  According to the Bankruptcy Court, it was Blecker's burden to "prov[e] the amount of his claim."  Order at 3 [AA385].  The Bankruptcy Court overlooked the fact that the Trustee conceded that the total deposits in the Blecker Accounts were $577,350 and that was the precise amount that Blecker was claiming.  *See* Order at 33 [AA415].  Therefore, the burden shifted to the Trustee to prove that there were sufficient withdrawals to reduce

the net equity in the Blecker Accounts to zero. *See F.O. Baroff Co.*, 497 F.2d at 282 (claimant bears the initial burden of establishing that he is a customer and has a claim against the customer property pool); *Net Equity Decision*, 654 F.3d at 236 (customer status is established simply by showing that the claimant deposited cash with a broker for the purpose of purchasing securities).

Even though the Trustee acknowledged that the deposits in the Blecker accounts totaled $577,350, the Bankruptcy Court held that Blecker "did not make a *prima facie* showing that the amount of the Blecker Claims was greater than zero" because he relied on the Trustee's Determination Letters, PCX 17 and PCX 23, to prove his deposits and those Determination Letters "also showed that the PW Transactions alone greatly exceeded the deposits and resulted in zero net equity." Order at 33 [AA415]. The Bankruptcy Court over-ruled Bleckers' objections to the Principal Balance Calculations, in part because each Determination Letter included a chart that contained the same information as the Principal Balance Calculations. *See* Order at 39 [AA421]. However, Blecker consistently disputed the Trustee's claim that he received any payments from Madoff. Blecker relied on the Determination Letters for the limited purpose of establishing deposits, and this was appropriate because these represented party admissions by the Trustee. *See* Fed. R. Evid. 801(d)(2). The Bankruptcy Court cited no authority for the proposition that a party can rely upon a statement in a document prepared by the other party only by conceding that the entire document is accurate. Order at 39 [AA421].

While the Bankruptcy Court would not allow Blecker to rely upon an admission by the Trustee in the Determination Letters, the Court allowed the Trustee to rely on the customer statements to establish withdrawals, even though they showed that the Blecker

Accounts had a balance of approximately $2.63 million.  Finally, the Bankruptcy Court held that Blecker's testimony was incredible, even though it was unimpeached and even though, at a previous hearing, the Bankruptcy Court had acknowledged that it found Blecker to be credible based on the very same testimony.  *See* February 24, 2016 Transcript at 15:12-19 [AA23] (doubting the Trustee's interpretation of the PW entries in Blecker's case based on a lack of factual evidence).

The Bankruptcy Court cited Blecker's testimony that he thought PW Entries represented checks sent to corporations to purchase securities for his account to conclude that "whether they were checks sent to the corporation or checks sent to Blecker," they must have necessarily been debits or cash outflows.  Order at 34 [AA416].  Obviously, this misconstrued Blecker's testimony and, without introducing into evidence a complete set of Blecker's statements, there was no way to prove or disprove that Madoff purchased for Blecker stock of the corporations named.

The Bankruptcy Court relied on Madoff's internal records for a rank hearsay purpose in holding that the Blecker Accounts were "Send" accounts and that Blecker received PWs automatically, simply because Madoff's internal records listed "S" associated with two of the Blecker Accounts.  Order at 40 [AA422].  However, the "S" notations were written on unspecified dates and in handwriting that no former Madoff employee was able to identify.  For all the Court knew, the "S" could have been inserted by a dishonest Madoff employee who stole the checks drawn on the account.  The Bankruptcy Court acknowledged that a customer had to send written instructions to switch from "S" to "R" accounts or *vice versa*, Order at 13 [AA395], and simply footnoted the

fact that "[t]he trial record does not reflect a written request by the Bleckers to switch from 'Send' to "Reinvest' for those accounts."  Order at 41, n. 27 [AA423].

## SUMMARY OF ARGUMENT

### I.  The Bankruptcy Court had no power to eviscerate the FRE

The Bankruptcy Court held  that customers of dishonest brokers are not entitled to the protections of the FRE because "[t]he Trustee's statutory obligation is to discharge net equity claims of customers of the debtor 'insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the Trustee.'"  Order at 4 [AA386] (quoting SIPA § 78fff-2(b)); *see also* Order at 16 [AA398] ("In ruling on the objections, it is necessary to bear in mind that a SIPA trustee must make payments to customers based on their net equity 'insofar as the amount owed to the customer is 'ascertainable from the books and records of the debtor . . .'") (citation omitted).  This was clear error because there is no statutory authority for relieving SIPA trustees of the requirements of the FRE.  Indeed, the integrity of SIPA liquidations requires strict compliance by the Trustee with the FRE.

### II.  The Trustee and the Bankruptcy Court relied upon inadmissible evidence

The deposits into the Blecker Accounts were undisputed.  Therefore, the burden shifted to the Trustee to prove withdrawals.  Collura supported Blecker's position because she admitted that there was not a single piece of Third-Party Evidence.  Thus, the only evidence the Trustee adduced concerning the PWs in Blecker's accounts was the testimony of Greenblatt who relied upon his Principal Balance Calculations admitted pursuant to FRE 1006.  However, the Principal Balance Calculations were derived 100% from hearsay contained in Madoff's internal records which, the Trustee's expert admitted, were "permeated with fraud."

For summary evidence to be admissible, the underlying evidence must itself be admissible. Summary evidence is **entirely inadmissible** if it consists of **any** evidence that is inadmissible. *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1260 (9th Cir. 1984) ("And it is clear that a summary of both inadmissible and admissible hearsay should not be admitted under Rule 1006."). Here, not a single Madoff employee was able to attest to the accuracy of the internally-generated records. The only evidence consisted of Madoff's customer statements. If the Principal Balance Calculations are admissible, then this means that Madoff's customer statements, spanning twenty-six years (1982-2008), including the PW notations thereon, are admissible hearsay and they can be relied on to establish the accuracy of 180 separate PW transactions. *See* Order at 36 [AA418].

Our research indicates that, in the entire history of the FRE, the business records exception has never been construed to allow admission of summary evidence of three decades of records which are "permeated with fraud" and are completely uncorroborated by any third-party documents. The only case relied on by the Bankruptcy Court, *IMA*, does not support the extension of the business records exception to such records and there is nothing in SIPA or its legislative history which would justify relieving a SIPA Trustee of compliance with the FRE.

## III.   Blecker did not ratify the PW transactions

The Bankruptcy Court held that Blecker ratified the PW Transactions pursuant to a contractual clause in the Customer Agreements, purportedly executed in November 1992, which required customers to object to transactions within 10-days of receiving confirmations, customer statements, or other completely indecipherable documents created by Madoff for the precise purpose of deceiving his customers. However, this clause, even

if otherwise applicable, cannot possibly apply retroactively to hold that Blecker ratified transactions that predated 1992.

But the doctrine of ratification does not apply here.  "An investor may 'ratify' an unauthorized trade by his conduct."  *In re Great E. Sec., Inc.*, 2011 WL 1345152, at *6 (S.D.N.Y. Apr. 5, 2011).  However, "[a]n investor ratifies an unauthorized trade by acquiescing in it, and will be found to have acquiesced in a trade if the investor knew the pertinent facts surrounding the transaction and manifested a clear intent to approve it."  *Id*. Here, Blecker did not know the pertinent facts surrounding the transactions, *i.e.*, he did not know that Madoff was a fraud; he did not know what PW meant; and he did not know that the entry indicated that a check was allegedly sent to him.  No witness could confirm that Blecker actually requested or received PWs.  Thus, Blecker did not ratify the PWs.

Moreover, ratification cannot apply because the Trustee cannot enforce the Customer Agreements against Blecker.  Under the doctrine of *in pari delicto*, the Trustee steps into Madoff's shoes.  Madoff materially breached the Customer Agreements and, therefore, the Trustee is unable to enforce their provisions against Blecker.  Moreover, Section 29(b) of the Exchange Act of 1934 ("Section 29(b)") controls the enforcement of a fraudulent securities contract, and it leaves the decision to enforce or rescind solely to the innocent party.

## IV.   **Blecker met his burden of proof**

The Bankruptcy Court held that Blecker failed to come forward with any competent evidence to establish the amount of the Blecker Claims.  However, it was only Blecker's burden to establish customer status, which was admitted by the Trustee; he was not required to disprove each of the alleged 180 separate alleged PWs. Blecker adduced his own testimony and the testimony of his son; additionally, Blecker's affirmative, non-hearsay

evidence included the fact that Madoff has no records evidencing that Blecker ever requested or received PWs and Collura admitted that she could not reconcile the Blecker Accounts.

## **ARGUMENT**

### I.   **The Orders must be reversed because of the Bankruptcy Court's evidentiary errors**

#### A. **The FRE applies in SIPA liquidations**

The Bankruptcy Court's decision rested on its conclusion that a SIPA Trustee does not have to comply with the FRE and, conversely, that a customer of an SEC-regulated broker is not entitled to the protections of the FRE. Order at 4 [AA386] (quoting SIPA § 78fff-2(b)); *see also* Order at 16 [AA398]. This was legal error. The FRE were enacted by Congress and are binding on the federal courts, including bankruptcy courts, like any other statute. See FRE 1101(a) ("These rules apply to proceedings before: . . . United States bankruptcy . . . judges"); U.S. Const. art. I; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993) ("We interpret the legislatively enacted [FRE] as we would any statute."). Thus, "[t]he law in this area is clear. . . . Congress retains the ultimate authority to modify or set aside any judicially created rules of evidence and procedure that are not required by the Constitution. . . ." *Dickerson v. United States*, 530 U.S. 428, 437 (2000). "Congress has now spoken to the issue and Congress, not the court, has the final say." *United States v. Ragghianti*, 560 F.2d 1376, 1380-1381 (9th Cir. 1977).

There is no authority for the proposition that a SIPA trustee does not have to comply with the FRE. On the contrary, the Supreme Court has repeatedly held that federal courts "cannot alter evidentiary rules merely because litigants might prefer different rules in a particular class of cases." *Salerno*, 505 U.S. at 322 (criminal case against Mafia

defendants); *see also Tome v. United States*, 513 U.S. 150, 166 (1995) (quoting same with respect to cases involving prosecution of child abusers); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989) ("[P]rodigious scholarship" says that it is irrational to allow impeachment based on conviction of felonies unrelated to veracity, but "if Congress intended otherwise, however, judges must adhere to its decision").  If Mafia defendants and child abusers are entitled to equal protection of our evidentiary laws, then so, too, are innocent victims of securities fraud.

Had Congress intended for the FRE to be inapplicable in SIPA proceedings, it would have said so in plain and unmistakable terms.  *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 189 (1978) ("'[R]epeals by implication are not favored'" . . . . "the intention of the legislature to repeal must be clear and manifest.'") (citation omitted); *Morton v. Mancari*, 417 U.S. 535, 550 (1974) ("[T]he only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.").  There is no provision of SIPA or the Federal Rules that relaxes the rules against hearsay.  The Bankruptcy Court's failure to apply the FRE as written is a legal error that requires *de novo* review.  *See, e.g.*, *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (the trial court necessarily abuses its discretion by basing its ruling on an erroneous view of the law or misapplication of the relevant legal principle).

Any evidentiary difficulties experienced by the Trustee in ascertaining deposits and withdrawals "based on the books and records of the debtor" are of the Trustee's own making.  The Trustee stands in the shoes of Madoff whose books and records, in the words of the Trustee's expert, are "permeated with fraud."  The Trustee has used that fact to his own advantage in saving SIPC billions of dollars on its obligation to pay SIPC insurance

to each customer based on the customer's last statement balance, as required by SIPA. Recognizing that books and records may not always be available, Congress gave a SIPA trustee the authority to pay claims in the absence of complete debtor records.  SIPA was created when "severe back office problems in the securities industry result[ed] in substantial inaccuracies in account records . . . ."  *See In re MV Secs., Inc.*, 48 B.R. 156, 159 n.5 (Bankr. S.D.N.Y. 1985).  In the absence of records, Congress allowed the trustee charged with the duty of investigating the estate the discretion to satisfy obligations that are established to his satisfaction. *See* SIPA § 78fff-1(a)(4).  However, nowhere does SIPA relieve the Trustee of compliance with the FRE.  Congress' intent was to protect investors; not to protect the members of SIPC from their statutory obligation to fund SIPC insurance. The "books and records" language of SIPA does not relax the rules against hearsay and, surely, if Congress had intended to relax the FRE in SIPA liquidations, it would have so provided.

If the Trustee had not selected the Net Investment Method for calculating Net Equity, then the Trustee would merely need to honor net equity claims based on the customer's last statement balance.  *See Net Equity Decision*, 654 F.3d at 233 ("Some customers objected to the Trustee's method of calculating 'net equity' and argued that they were entitled to recover the market value of the securities reflected on their last BLMIS customer statements (the 'Last Statement Method.')").  There was no reason why the Trustee could not have selected the Last Statement Method.  *See id.* at 238 ("[A] customer's last account statement will likely be the most appropriate means of calculating 'net equity' in more conventional cases. We would expect that resort to the Net Investment Method would be rare because this method wipes out all events of a customer's investment history

except for cash deposits and withdrawals. The extraordinary facts of this case make the Net Investment Method appropriate, whereas in many instances, it would not be."). And there is nothing in the *Net Equity Decision* which suggests that the Trustee is not bound by the FRE where a customer challenges the Trustee's claim determination.  Nor could there possibly be a justification for having a different set of rules for victims of securities fraud.

### B. It was legal error to hold that testimony relating to customers other than Blecker was relevant

"Relevance is a question of law" to be reviewed *de novo.  United States v. Torniero*, 735 F.2d 725, 730 (2d Cir. 1984), *cert. denied,* 469 U.S. 1110 (1985).  Here, the Bankruptcy Court erred in permitting the Trustee to overcome his inability to prove that Blecker ever received a PW check by pointing to the accounts of *other* customers who do not dispute that they received PWs.  Order at 22 [AA404].

Indeed, Blecker's situation is unique in this case, among the entire customer body because he claims he never took a single withdrawal and that is consistent with the Trustee's own contentions for the period following 1997.  And surely the account activities with respect to other customers are irrelevant to prove that Blecker received PWs.  *See*, *e.g*., *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 140 (S.D.N.Y. 2015) ("It is of no assistance to a jury to know that Fortress chooses to invest in other distressed assets . . . . This evidence is therefore excluded . . ."); *LNC Invs. Inc. v. First Fid. Bank N.A.*, 2000 WL 1072460, at *6-7 (S.D.N.Y. Aug. 3, 2000) (excluding evidence as irrelevant because what may have occurred on one occasion is not relevant to what could have occurred under different circumstances).

The fact that Blecker may be one of the only customers who did not receive PWs, even though they were indicated on his account, does not mean that the Trustee is entitled

to ignore the evidence with respect to Blecker and treat him as if he did receive the withdrawals.  The issue is not a statistical one.  *See People v. Risley*, 214 N.Y. 75, 84-87 (1915) (probability cannot be used to establish a fact, even if probability is 1 in 4 billion); *Hollander v. American Cyanamid Co.*, 172 F.3d 192 (2d Cir. 1999); *People v. Collins*, 438 P.2d 33, 41 (Cal. 1968) (improper to convict defendant by reliance on evidence that there was 1 in 12 million chance that defendants were innocent because the courts cannot conduct a "trial by mathematics"); *Ege v. Yukins*, 380 F. Supp.2d 852, 876-77 (E.D. Mich. 2005) (listing cases and granting writ of habeas corpus where conviction was based upon statistical evidence), *aff'd in part, rev'd in part*, 485 F. 3d 364 (6th Cir. 2007); *United States v. Shonubi,* 103 F.3d 1085 (2d Cir. 1997) (statistical evidence cannot be used to estimate quantities); *Presser v. Key Food Stores Co-op, Inc.*, 24 IER Cases 1596, 2006 WL 2086346, at *19 (E.D.N.Y. July 25, 2006) (expressing "strong feelings that such applications [of mathematical techniques in the proof of facts] . . . must be critically examined in view of the substantial unfairness to a defendant which may result from ill-conceived techniques with which the trier of fact is not technically equipped to cope") (citation omitted) (alterations in original) *aff'd* 316 Fed. Appx. 9 (2d Cir. 2009); *Campbell v. Bd. of Ed.*, 310 F. Supp. 94, 105 (E.D.N.Y. 1970) ("[C]omputations offered at the trial were . . . not based upon any model demonstrably reflective of a real situation").

Thus, the Bankruptcy Court erred in admitting statements of customers other than Blecker.  It does not matter that this is an "omnibus proceeding."  The Trustee had to prove with admissible evidence that Blecker received PWs and it was error for the Bankruptcy Court to hold that "'other customer' records relied on by the experts tends

to make it more probable that PW Transactions represented cash withdrawals in any individual customer case."  Order at 22 [AA404].

### C. The business records exception was not applicable

> 1. <u>The Bankruptcy Court's construction of the business records exception is reviewed *de novo* because the Bankruptcy Court failed to apply all of the elements of the business records exception</u>

FRE 803(6) provides that business records reflecting an act or event may be admitted, despite containing hearsay, only if they satisfy the following requirements:

> (A) the record was made at or near the time by–or from information transmitted by–someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

*See also* FRE 803, advisory committee's note ("The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.").

The Bankruptcy Court did not apply the elements of the business records exception. *See* Order at 23-26 [AA405-8].  This was an error of law because the Bankruptcy Court cannot modify the FRE.  *See Salerno*, 505 U.S. at 321 ("Nothing in the language of Rule 804(b)(1) suggests that a court may admit former testimony absent satisfaction of each of the Rule's elements.").  Here, the elements of the business records exception were not met.

2.   <u>The hearsay statements were made by unknown authors at unspecified times, and never by those with first-hand knowledge</u>

No former Madoff employee could identify the author of the PW notations on customer statements.  With respect to the "S" or "R" notations in the Bleckers' customer files, the only employee who could even speculate as to the authorship of these notations was Bongiorno, who thought one "S" "looks like Jodi's handwriting to me," referring to Madoff's convicted co-conspirator.  But Bongiorno could not be sure; she testified that the "S' on another form was her own, but she could not attest to the date any notation was made, did not recall making any notation, and testified that the "S" might have meant that Madoff – not Blecker – wanted the account to be a "Send" account.  *See* Bongirono Tr. at 86:19-87:14, 105:5-106:10, 221:17-20, 225:14-16.  Bongirono testified that there was no regular business practice for recording the date a form was marked "S" or "R" and there were notations made on Blecker's ledger paper of unknown authorship, some of which she could not understand.  *Id*. at 221:17-226:24.  Therefore, the Trustee could not establish that the authors had firsthand knowledge of the information they were entering.  It was the Trustee's burden to make this showing, FRE 803(6), but the Bankruptcy Court ignored these requirements.

Courts applying Rule 803(6) have stressed that the "trustworthiness" of the information is the "principal precondition to admissibility."  *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal quotation marks omitted); *JPMorgan Chase Bank, N.A. v. Yuen*, 2013 WL 2473013, at *6 (S.D.N.Y. June 3, 2013).  An inference of reliability flows from the satisfaction of the enumerated components of R. 803(6).  While some courts have found, in specific instances, that particular documents satisfy this trustworthiness requirement even though the proponent could not identify the author or date of the entry,

they have always required other indicia of reliability and trustworthiness for admission. *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003) (citing Fed. R. Evid. 803(6), advisory committee's note) (explaining that the purpose of Rule 803 is to "'relax[] the requirement of producing as witnesses, or accounting for the nonproduction of, all participants' in the gathering and 'recording of ordinary business records'" because "business records are made reliable by 'systematic checking, by regularity and continuity which produce habits of precision' . . .") (internal citation omitted)).

Here, on the other hand, the Trustee himself admitted, through his expert, that Madoff's records were unreliable, that they were "permeated with fraud." And the former Madoff employees testified that they could not vouch for any of the information on the internal Madoff records relating to the Bleckers. How can the Trustee possibly be allowed to rely on such records in denying a customer claim? The business records exception is inapplicable when there is an "incentive to falsify or alter" the records. *See Yuen*, 2013 WL 2473013, at *7.

Moreover, the fact that Madoff himself was the underlying source of the instruction to enter "S" or "PW" and that such instructions were supplied third hand to the author vitiates the notion that the entries were made from firsthand knowledge in the ordinary course of business. *See* Order at 12 [AA394]. ("Madoff would . . . instruct Ms. Bongiorno of the decision and direct her to memorialize it in the customer's account file with an appropriate notation."). To satisfy the "essential link" between the informant and the author, the Trustee must also show that the source of the information – Madoff – was complying with a business obligation to convey true and accurate statements. *See*, *e.g.*, *Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993). If the supplier of the information

does not act in the regular course of business, "'then an essential link in the trustworthiness chain fails.'"  *U.S. v. Blechman*, 657 F.3d 1052, 1066 (10th Cir. 2011) (citation omitted).

Where, as here, the Trustee claims that the recorded trades that ostensibly produced the "profits" were entirely fictitious and intended to perpetuate fraud, he is not entitled to the conflicting presumption that Madoff supplied accurate information concerning the customers' accounts to those who entered the notations on Madoff's records.  *See*  FRE 803, advisory committee's note ("If . . . the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail.").

> 3.   The Bankruptcy Court misapplied the hearsay exceptions

The Trustee did not have a single document evidencing that Blecker ever requested PWs.  He had no letters from Blecker; he had no checks to Blecker; he had no cancelled checks from Blecker; he had no check stubs evidencing checks to Blecker.  Yet, he had such evidence for hundreds of customers who never disputed that they received PWs.   The Bankruptcy Court ignored all of this evidence and, even though it applied the business records exception in FRE 803(6) to admit the Madoff statements for their truth, it refused to apply another hearsay exception, FRE 803(7) to make a far more reliable inference.  Rule 803(7) provides as follows:

> (**7**) *Absence of a Record of a Regularly Conducted Activity***.** Evidence that a matter is not included in a record described in paragraph (6) if:
>
> (**A**) the evidence is admitted to prove that the matter did not occur or exist;
>
> (**B**) a record was regularly kept for a matter of that kind; and

> **(C)** the opponent does not show that the possible source of the information or other circumstances indicate a lack of trustworthiness.

FRE 803(7). The advisory committee's notes to Rule 803(7) state that the "[f]ailure of a record to mention a matter which would ordinarily be mentioned is satisfactory evidence of its nonexistence." As the Second Circuit explained: "[t]he absence of a record of an event which would ordinarily be recorded gives rise to a legitimate negative inference that the event did not occur." *United States v. Robinson*, 544 F.2d 110, 114 (2d Cir. 1976).

Here, the Bankruptcy Court completely misconstrued the FRE in selectively applying 803(6) but not 803(7), which would have required far less of a logical leap, especially because evidence concerning the absence of a record is not even hearsay. *See* Wright & Miller, Federal Practice & Procedure, § 6872 (evidence admissible through 803(7) is ordinarily not even hearsay); *see also* FRE 803(7), advisory committee's note ("While probably not hearsay as defined in Rule 801 . . . . In order to set the question at rest in favor of admissibility, it is specifically treated here.). The absence of records requesting PWs or documents evidencing checks payable to Blecker in Madoff's files is evidence that Blecker did not receive PWs. The Bankruptcy Court's treatment of this issue constitutes reversible error.

### 4. Madoff failed to maintain regular practices

The Bankruptcy Court relied on the testimony of Bongiorno and Sala as to Madoff's record-keeping practices. *See* Order at 25 [AA407]. ("[Bongiorno and Sala] explained how BLMIS created the books and records in the ordinary course of its business, including the customer statements and the "S" and "R" notations in the customers' files, and in particular, how the entries relating to the cash transactions, including the PW Transactions,

were recorded at or about the time they were executed."). However, as set forth *supra*, Madoff did not maintain regular practices.

Bongiorno testified that BLMIS had a "different story" every five to ten years. Bongiorno Tr. at 15:7-20. For instance, during one unidentified period, Madoff decided to make all new accounts "Send" accounts. Bongiorno Tr. at 35:1-9. Jackson testified that employees gave Madoff PW checks directly on occasion, trusting Madoff to give the checks to the client personally. Jackson Tr. at 110:19-110:25. Further, in 1998, BLMIS underwent considerable changes related to the PW notations, most notably the switch from an arbitrage system to an options system. Sala Tr. at 29:6-23; Bongiorno Tr. at 60:6-61:10. Whereas arbitrage checks would theoretically be sent every time a profit was realized, options checks went out far less frequently.

From 1984-1998, Sala tracked the purported arbitrage trades that created the non-existent profits. Sala Tr. at 188:6-188:9. She testified that she did not know whether any of her practices were carried forward as the accounts were moved to the options model after her retirement in 1998. Sala Tr. at 224:7-224:15.

The evidence reveals that BLMIS changed its accounting policies and did not follow internal guidelines for reporting. Indeed, the Trustee's professionals admitted that they found hundreds of errors in their review. For example, the Bankruptcy Court held that the "House 17 Manual," which was admitted over Blecker's objection, is evidence that the PW notations followed a specific process and, therefore, each such notation indicates a check mailed to a customer. *See* Order at 9 [AA391]. With respect to the PW notations, the House 17 Manual directs the employee to write PW "[o]n description type 'check & stock name'" with a notation at the bottom of that page indicating to punch PW and CW

checks as debits.  TX080 at MADTSS00336545.  However, BLMIS employees regularly failed to follow these instructions, and the Trustee's experts included many non-conforming transactions as PWs.  *See, e.g.*, Tr. at 121:3-24; 128:3-10; 144:21-145:7; 219:3-8.

Similarly, the Trustee's professionals admitted that they found conclusive evidence that 800 PW notations represented checks to customers that were not cashed.  Tr. at 231:7-232:8.  However, the Trustee did not disclose who the payees were on those 800 checks.  For all we know, all of Blecker's PW transactions could have involved checks made payable to a Madoff employee.

Moreover, the Trustee's professionals continue to uncover errors.  In a supplemental report, Greenblatt excluded six additional notations on the grounds that they were erroneously entered as PW notations and added 96 notations which he had previously determined were not PW notations.  *See* Tr. at 232:3-23.

There were numerous other mistakes.  To take just one example, PCX049 is a customer statement for Gunther Unflat, which was obtained from Gunther Unflat.  Blecker's counsel questioned Collura about it at trial for the non-hearsay purpose of illustrating the unreliability of the BLMIS records.  PCX049 shows that Unflat received a check for $4,226.20, which was deducted from his account.  But as indicated by PCX048, Unflat never cashed that check.  When asked, Collura admitted that she would have no way to verify whether it was ever cashed by Unflat without seeing a cancelled check or Unflat's personal account records, and she had neither for this transaction.  Tr. at 153:24-154:12.

In Blecker's case, of course, the Trustee does not have a single check allegedly made payable to Blecker.  Therefore, he has no way of knowing if, in fact, checks were

made payable to Blecker and, if so, whether they were cashed by Blecker or, instead, cashed by a dishonest employee.  SIPA and the FRE do not permit the Trustee to deny a customer's claim without any evidence for doing so.

     5.   <u>The Bankruptcy Court failed to consider that Participating Claimants showed that "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness"</u>

In failing to apply the elements of the business records exception, the Bankruptcy Court did not even consider whether Participating Claimants showed that the source of information or the method or circumstances of preparation indicate of lack of trustworthiness.  *See* FRE 803(6)(E) (hearsay is only admitted under FRE 803(6) if "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness").

Documents prepared in order to deceive are inherently unreliable, particularly where the Trustee succeeded in reducing SIPC's insurance obligations to Madoff's customers by $2 billion by representing that the statements Madoff sent to his customers were "permeated with fraud."[8]  Under these circumstances, Madoff's internally-generated records are inadmissible.  *See Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014); *In re M & L Bus. Mach. Co., Inc.*, 84 F.3d 1330, 1338 (10th Cir. 1996), *In re Agric. Research & Tech Grp., Inc.*, 916 F.2d 528, 535 (9th Cir. 1990).

Further, when considering whether a document was prepared by an untrustworthy source, courts examine whether the party providing the information had an incentive to misrepresent.  *Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943) (excluding accident report on the grounds that it was prepared in anticipation of litigation).  Here, as the Trustee has

---

[8] *See supra* Note 1.

represented, *inter alia,* to the Second Circuit, Madoff, a notoriously untrustworthy source, had a motive to misrepresent.

In *United States v. Dreer*, the Eleventh Circuit rejected a set of business records on the grounds that other records in the business were falsified.  740 F.2d 18 (11th Cir. 1984). The court held that "[a]lthough the proponent of the records did not admit that the records were falsified, there was an extremely strong inference arising from evidence of numerous other forged financial documents that the proffered evidence was not genuine."  *Id*. at 20.

Here, unlike legitimate businesses that rely on accurate records to maintain profitability and avoid regulatory issues, the *inaccuracy* of Madoff's records was integral to the survival of Madoff's fraud.  As the Trustee represents, Madoff misled innocent customers to hide the fact that no trades were occurring and the customer was not actually making any return.  This incentive to misrepresent disqualifies the Madoff records from admission under FRE 803(6).  The Bankruptcy Court did not even consider this, despite being required to do so under FRE 803(6).

## II.    The Bankruptcy Court erred in relying on *IMA*

The Bankruptcy Court relied on *IMA* to hold that, because summary exhibits were admissible there, and that case involved a financial fraud, then summary exhibits of the Madoff records could similarly be admitted for their truth.  781 F.3d 1262 (11th Cir. 2015). However, there is a pivotal factual distinction between this case and *IMA*: in *IMA*, the summary exhibits were consistent with reliable third-party records.  *Id.* at 1265-67 ("[A]ll of the underlying documents . . . substantially matched the records kept by the financial

institutions and clients with which IMA had transacted."); *IMA* Tr.[9] at 110:7-16 [AA458]

(IMA trustee subpoenaed all banks at which IMA had accounts); *IMA* Tr. at 103:23-104:11

[AA455-6] ("We . . . confirmed that data with third-party data and other sources, such as

communications with the investors.").

　　Indeed, in *IMA* it was alleged that the Ponzi scheme lasted only eight years, *IMA*

Tr. at 25:17-21 [AA454], and thus its records could be – and were – corroborated with

reliable third-party evidence.  We have found no case in the entire country which has

applied the business records exception to hold that uncorroborated internal records of a

fraudulent scheme are so reliable that summaries of the fraudulent records can be used to

prove a material fact.  The Bankruptcy Court has done so here, in the largest financial fraud

in the history of the world.

　　In *IMA*, the trustee of the failed broker-dealer, who was a CPA and CFA, created

summary exhibits of the debtor's underlying records to show the general financial

condition of the debtor in order to prove the debtor operated a Ponzi scheme.  All of the

information contained in the summary exhibits was corroborated by third-party records

kept by the financial institutions and clients with which IMA had transacted business, many

of which the Trustee had subpoenaed.  781 F.3d at 1265; *IMA* Tr. at 110:7-16 [AA458].

The *IMA* trustee's testimony was uncontested, as no other witness testified.  The

bankruptcy court admitted the summaries on the basis that the underlying evidence was

admissible under the residual hearsay exception, FRE 807, although the Eleventh Circuit

---

[9] Many of the relevant facts in *IMA* are discerned from a review of the transcript of the consolidated proceedings in the bankruptcy court.  This Court may take judicial notice of those proceedings.  A true and correct copy of excerpts of the transcript is supplied with Participating Claimants' Appendix at [AA449-64].

later upheld their admissibility under FRE 803(6).  *See IMA* Tr. at 165:16-168:3 [AA460-1].  Notably, the *IMA* trustee could not – and did not even try to – reconcile all of the customers' deposits and withdrawals,  *IMA* Tr. at 109:11-22 [AA457], 119:4-21 [AA459], as Greenblatt purports to do based only on Madoff's records.

Here, of course, the Trustee contended that the underlying records were permeated with fraud and there was no third-party evidence supporting Greenblatt's summary exhibits.  Yet, the Bankruptcy Court held that the completely uncorroborated underlying evidence, *i.e.,* Madoff's statements, were admissible for a rank hearsay purpose: to prove that Blecker received 180 checks from Madoff despite the complete absence of any Third-Party Evidence.  Order at 23-26 [AA405-8].

Moreover, unlike Greenblatt, the *IMA* trustee engaged in an unbiased fact-finding mission.  He interviewed IMA's customers, investors, principals, and employees to learn the procedures used to create IMA's documents.  With the help of an international accounting firm, he cross-checked IMA's own documents with those kept by the financial institutions and the customers.  781 F.3d at 1265.  Greenblatt, on the other hand, testified that he did nothing other than review Madoff's own records with respect to four of Blecker's nine accounts. Greenblatt never interviewed a single BLMIS employee to the extent "forensic account[ant]s normally do," and instead he only asked them "procedural questions," such as where files were maintained.  Tr. at 227:22-228:8.

Given the fact that the summary evidence submitted to the bankruptcy court in *IMA* was corroborated by reliable third-party records, the *IMA* holding provides no support for the Bankruptcy Court's Order.

**III.** **The Orders must be reversed because Blecker did not ratify the PW Entries**

The Bankruptcy Court attempted to justify its disregard of Blecker's evidence by holding, as an alternative basis for the Order, that Blecker "ratified" the PWs by entering into the 1992 agreements with Madoff. But any acknowledgment Blecker made in 1992 could not ratify pre-1992 transactions, especially when those transactions were listed on customer statements intentionally designed to deceive the customer. The Bankruptcy Court's interpretation of a contract is reviewed *de novo*. *See, e.g.*, *Lee v. BSB Greenwich Mortg. Ltd. P'ship*, 267 F.3d 172, 178 (2d Cir. 2001); *see also Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 936 F.2d 640, 645-46 (2d Cir. 1991) (reversing the district court's holding regarding ratification without any deference to the district court's legal conclusions).

**A. It was legal error for the Bankruptcy Court to rely on 1992 contracts to hold that Blecker ratified pre-1992 PW transactions**

The two Customer Agreements cited by the Bankruptcy Court as the basis for its ratification holding were purportedly executed in November 1992 – when Blecker was 81 years old. Order at 31 [AA413] (citing TX045, TX049). These customer agreements obviously cannot, and did not purport to, retroactively ratify alleged PWs that pre-dated the agreements. *See* TX045 at 28; TX049 at 11. *See, e.g.*, *Lafleur v. MLB Indus., Inc.*, 861 N.Y.S.2d 803 (2008) (contracts are generally only effective from the date of execution). The Bankruptcy Court did not even address this issue and its holding was clear legal error. If the pre-1992 PW transactions are not counted as reductions to Blecker's net equity, then Blecker has a positive net equity and the Trustee has failed to prove the amount of Blecker's withdrawals.

**B. The doctrine of ratification does not apply**

In the context of securities trading, the doctrine of ratification is ordinarily only raised as a defense to claims by a customer against a broker for unauthorized trading. Ratification does not apply at all in this case. "An investor may 'ratify' an unauthorized trade by his conduct." *In re Great E. Sec., Inc.*, 2011 WL 1345152, at *6. But this standard is not easily met. "An investor ratifies an unauthorized trade by acquiescing in it, and will be found to have acquiesced in a trade **if the investor knew the pertinent facts surrounding the transaction and manifested a clear intent to approve it."** *Id*. at *6 (emphasis added). Here, Blecker did not know the pertinent facts surrounding the transaction: he did not know that Madoff was a fraud, he did not know that each PW entry represented a check that should have been paid to him; he never received a check from Madoff; and he never informed Madoff that he wanted to receive withdrawals. Thus, Blecker did not manifest a clear intent to take profits out of his accounts. On the contrary, he never wrote a letter to Madoff asking for a withdrawal.

Moreover, "[t]he purpose of the ten-day written complaint clause in the customer agreement is to require the customer to memorialize his complaint immediately after receipt of the account statement rather than waiting to see if the trade is profitable." *Modern Settings, Inc.*, 936 F.2d at 645-46. This purpose is not furthered by application of the doctrine to this case. This is not a case where Blecker was aware of an unauthorized trade, waited to see if it would be profitable, and then later sought to rescind it only after learning that it had moved against him. If the doctrine of ratification is applicable in this case, that is, if the Trustee is going to treat fictional statements as reality, the doctrine should be applied against the Trustee to compel him to pay Blecker his last-statement balance of $2.63 million. *See* PCX015 at 2. The Trustee cannot cherry-pick only those

portions of the customer statements that reduce SIPC's financial obligation to defrauded customers.

The Bankruptcy Court's holding was particularly erroneous because, as numerous courts have held, the Madoff statements were specifically designed to mislead customers. The Bankruptcy Court held that Blecker should have understood the statements, apparently because he was a "successful CPA," but Blecker already testified that he had "no way to prove whether . . . [his Madoff statements] w[ere] correct or not."  Blecker Tr. at 14:14-20. The SEC was unable to detect Madoff's fraud in a decade after being tipped off to it in 1999.  *See* Markopoulos, *The World's Largest Hedge Fund is a Fraud*, available at https://www.sec.gov/news/studies/2009/oig-509/exhibit-0293.pdf (last accessed October 27, 2018). Yet, according to the Bankruptcy Court, Blecker, in his 80s, should have detected it in ten days or less. Clearly, where the Madoff statements are virtually indecipherable, ratification cannot apply.  *See Modern Settings, Inc.*, 936 F.2d at 646 ("There will be instances where a disparity in sophistication between a brokerage firm and its customer will warrant a flexible application of such written notice clauses.").

The Bankruptcy Court cited the fact that Blecker's handwriting is found on an indecipherable BLMIS statement.  *See* Order at 31 [AA413] (citing TX082). However, it is impossible for anyone to understand what that statement (or Blecker's notes) might mean.  *See* TX082.  Cryptic brokerage statements intentionally designed to mislead cannot form the basis of ratification.  *See  Karlen v. Freidman & Co.*, 688 F.2d 1193, 1200 (8th Cir. 1982), ("It has been recognized that confirmation slips and monthly statements do not enable a customer to determine his or her overall position or the total amount of real profit

or loss occurring, unless the customer is sufficiently skilled to elaborate upon them to make that determination.").

The Bankruptcy Court further held that Blecker ratified the PW transactions because he thought they represented purchases of securities for his accounts. According to the Bankruptcy Court, "whether they were checks sent to the corporation or checks sent to Blecker, they were still debits or cash outflows." Order at 34 [AA416]; *see also id*. at 32 [AA414]. However, this is false: If PW transactions were checks written to corporations to purchase securities, then the PW transactions would produce inflows of securities. *See* Blecker Tr. at 14:14-20 ("[I] assumed what they put on my statement must have been *in* my account.") (emphasis added).

Although the Bankruptcy Court gave *one* example of an instance where one of the 180 PW notations related to a security that was not listed on Bleckers' statement the following month, Order at 44 [AA426], the  Trustee failed to put into evidence all of Bleckers' account statements. Indeed, in total, only *one* set of consecutive monthly statements was put into evidence by the Trustee. Had the Trustee put all of Blecker's statements into evidence, the Court would have been able to make an accurate determination of the facts, and the Trustee would have done so if he could offer more than one example. But the Trustee chose not to put that evidence before the Court.

## IV.   **The Trustee is barred by the doctrine of *in pari delicto* from enforcing Madoff's contract against customers whom he defrauded**

Section 29(b) of the Exchange Act controls the enforcement of a fraudulent securities contract and it leaves the decision to enforce or rescind solely to the innocent party:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the

> performance of which involves the violation of … any provision of
> this chapter or any rule or regulation thereunder, shall be void (1) *as
> regards the rights of any person who, in violation of any such
> provision, rule, or regulation, shall have made or engaged in the
> performance of any such contract . . . .*

15 U.S.C. § 78cc(b) (emphasis added).[10] Under Section 29(b), the innocent party may

choose whether to void a contract procured by fraud or to maintain an action for money

damages against the wrongdoing counterparty. *See, e.g.*, *Freeman v. Marine Midland

Bank-New York*, 419 F. Supp.440, 453 (E.D.N.Y. 1976) ("[T]he investor, at his option,

[may choose] to void the contract as a defense to a lender's suit, to sue on the contract

for damages, to enforce the contract, or to seek rescission.") (citations omitted).

Section 29(b) does not allow the Trustee to enforce any term in the Customer

Agreements against Blecker because, as the Second Circuit has recognized, the Trustee

stands in the shoes of Madoff and he is barred under the doctrine of *in pari delicto* from

asserting any position that Madoff is barred from asserting. *JPMorgan Chase*, 721 F.3d at

58 (holding the Trustee's common law claims against JPMorgan Chase on behalf of

BLMIS were barred by the doctrine of *in pari delicto*). Madoff could not enforce the 10-

day objection clause against those customers whom he has defrauded and, therefore, the

Trustee is similarly barred.

Madoff materially breached the Customer Agreements by converting Blecker's

money. A breach is material when it "substantially defeats the purpose of that contract."

*In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997). Thus, it is hornbook law that the Trustee,

who stands in Madoff's shoes, may not, as a party in material breach of the customer

agreement, enforce the 10-day-ratification provision against Blecker. *See, e.g.*, *Nadeau v.*

---

[10] SIPA is part of the Exchange Act. Thus, other provisions of the Exchange Act apply to
SIPA proceedings.

*Equity Residential Properties Mgmt. Corp.*, 251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017) ("Under New York law, when a party to a contract materially breaches that contract, it cannot then enforce that contract against a non-breaching party.").  It was error for the Bankruptcy Court to hold otherwise.

**V.    It was clear error for the Bankruptcy Court to hold that it was Blecker's burden to establish that he had net equity greater than zero when the deposits were undisputed and there was no third-party evidence of any withdrawals**

A claimant bears the initial burden of establishing that he is a customer and has a claim against the customer property pool. *See F.O. Baroff Co.*, 497 F.2d at 282.  Customer status is established simply by showing that the claimant deposited cash with a broker for the purpose of purchasing securities.  *See Net Equity Decision*, 654 F.3d at 236 (citing SIPA § 78*lll*(2)(B)(i)).  Here, it was undisputed that the deposits in the Blecker Accounts totaled $577,350.  *See* Order at 33 [AA415].  It was also undisputed that there was no Third-Party Evidence that the Bleckers ever took a withdrawal from Madoff.  Having established this, the Bankruptcy Court committed error by imposing on Blecker the burden to establish that he did not receive each PW that the Trustee alleges he received.  *See* Order at 33 [AA415].  After Blecker established the undisputed deposits and the lack of any reliable evidence that he took a withdrawal, it was the Trustee's burden to establish that Blecker's claim was zero.  The Bankruptcy Court held that the Trustee met his burden by introducing summaries of swarms of inadmissible evidence that was "permeated with fraud."  This was clear error.

## CONCLUSION

The Orders have created an insupportable precedent that is punitive to innocent victims of securities fraud.  They must be reversed.

The Court should hold that: (1) the FRE applies in SIPA liquidations; (2) Greenblatt's Principal Balance Calculations are inadmissible; (3) the Trustee adduced no admissible evidence that Blecker received PWs; (4) Blecker did not ratify any PWs; and (5) the Blecker Claims are allowed, in full, plus pre-judgment interest, to be paid within ten days of the entry of this decision.

November 2, 2018
                                        **CHAITMAN LLP**

                              By:   */s/ Helen Davis Chaitman*
                                    Helen Davis Chaitman
                                    Lance Gotthoffer
                                    Gregory M. Dexter
                                    465 Park Avenue
                                    New York, New York 10022
                                    (888) 759-1114
                                    hchaitman@chaitmanllp.com
                                    lgotthoffer@chaitmanllp.com
                                    gdexter@chaitmanllp.com
                                    *Attorneys for Aaron Blecker and*
                                    *Participating Claimants Highlighted on*
                                    *Exhibit A on the Joint Notice of Appeal*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 8015(a)(7)(B)</u>

Pursuant to Rule 8015(a)(7)(C)of the Federal Rules of Bankruptcy Procedure , the foregoing brief complies with Rule 8015(a)(7)(B) and Your Honor's November 1, 2018 endorsement of Participating Claimants' October 31, 2018 letter requesting, with consent of all parties, permission to file a brief not exceeding 17,000 words.

The word count is 16,316.

November 2, 2018                                                          **CHAITMAN LLP**

                                                                 By:   */s/ Helen Davis Chaitman*
                                                                        Helen Davis Chaitman
                                                                        Lance Gotthoffer
                                                                        Gregory M. Dexter
                                                                        465 Park Avenue
                                                                        New York, New York 10022
                                                                        (888) 759-1114
                                                                        hchaitman@chaitmanllp.com
                                                                        lgotthoffer@chaitmanllp.com
                                                                        gdexter@chaitmanllp.com

                                                                        *Attorneys for Aaron Blecker and*
                                                                        *Participating Claimants Highlighted on*
                                                                        *Exhibit A on the Joint Notice of Appeal*