**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-1789 (SMB) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | Appeal No. 18-cv-07449 (PAE) |
| BERNARD L. MADOFF, | |
| Debtor. | |

## APPELLANTS' REPLY BRIEF

**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone and Fax: (888) 759-1114
Helen Davis Chaitman
Lance Gotthoffer
Gregory M. Dexter
hchaitman@chaitmanllp.com
lgotthoffer@chiatmanllp.com
gdexter@chaitmanllp.com

*Attorneys for Aaron Blecker and
Participating Claimants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL OVERVIEW ................................................................................................. 4

ARGUMENT .................................................................................................................... 4

I.    The Trustee did not introduce any admissible evidence to prove that
Blecker's Net Equity should be reduced by the 180 PWs .................................. 4

     A.  The Trustee implicitly concedes that the Bankruptcy Court erred in
relaxing the FRE simply because this was a SIPA proceeding ................................. 4

     B.  The Trustee concedes that the Bankruptcy Court did not consider all
of the elements of FRE 803(6) ................................................................................. 5

     C.  FRE 803(6) is not satisfied by records of unknown authorship, where
the source of information recorded on the BLMIS records is an
admitted fraudster ..................................................................................................... 7

     D.  The Trustee does not even address the fact that Madoff did not
maintain regular practices ........................................................................................ 10

     E.  The Trustee does not seriously dispute that the Bankruptcy Court's
unprecedented decision cannot be supported by *IMA* ........................................... 12

     F.  The Bankruptcy Court failed to consider that Participating Claimants
made a showing of untrustworthiness under FRE 803(6)(E) .................................. 12

     G.  Other customer statements are irrelevant ................................................................. 13

     H.  The Principal Balance Calculations were inadmissible ........................................... 14

II.   It is not Blecker's burden to affirmatively make the impossible factual
showing that he did not receive each of the 180 alleged PW checks during
the period from 1981–1996 ............................................................................... 15

     A.  Blecker is a customer as a matter of law ................................................................. 15

     B.  The Trustee conflates "customer" status and "Net Equity" ..................................... 17

     C.  The cases cited by the Trustee do not establish that it is Blecker's
burden to affirmatively disprove receipt of each of the 180 PWs .......................... 17

D. The cases cited by the Trustee concerning customer status "in the air" are completely inapplicable .............................................................. 20

E. The Trustee is seeking to relitigate a holding of the *Net Equity Decision* ................................................................................................... 21

III. Blecker did not ratify the PW Transactions ........................................................ 22

A. The Trustee concedes that November 1992 contracts do not ratify pre-November 1992 PWs ....................................................................... 22

B. Participating Claimants expressly argued below that the Customer Agreements were not executed until November 1992 .............................. 22

C. The doctrine of ratification does not apply and Blecker could not have ratified the PWs ......................................................................... 23

D. The cases cited by the Trustee do not support the Bankruptcy Court's unprecedented extension of the ratification doctrine ................................ 28

E. Blecker did not ratify the pre-1992 trades by his conduct ....................... 29

F. The doctrine of *in pari delicto* and Section 29(b) of the Exchange Act bar the Trustee from relying on the 10-day provision ......................... 30

IV. To the extent Blecker was required to prove that he did not receive the 180 PWs, he met that burden ................................................................................. 31

A. The only admissible evidence clearly established that Blecker never received the 180 PWs ............................................................................. 31

B. Blecker did not waive his argument that the absence of any third-party records in the BLMIS files conclusively proves his case .............................. 31

C. The Trustee fails his own test ................................................................ 31

CONCLUSION ................................................................................................... 32

# TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases**

*In re A.R. Baron Co., Inc.*,
226 B.R. 790 (Bankr. S.D.N.Y. 1998) ..............................................................................18, 19

*In re Adler, Coleman Clearing Corp.*,
204 B.R. 111 (Bankr. S.D.N.Y. 1997) ...............................................................................20, 21

*In re Adler, Coleman Clearing Corp.*,
277 B.R. 520 (Bankr. S.D.N.Y. 2002) .........................................................................16, 19, 20

*Altschul v. Paine, Webber, Jackson & Curtis, Inc.*,
518 F. Supp. 591 (S.D.N.Y. 1981) ...........................................................................................30

*In re C.J. Wright & Co. Inc.*,
162 B.R. 597 (Bankr. M.D. Fla. 1993) .....................................................................................16

*Evanston Bank v. Conticommodity Servs., Inc.*,
623 F. Supp. 1014 (N.D. Ill. 1985) ....................................................................................23, 26

*In re Great E. Sec., Inc.*,
2011 WL 1345152 (S.D.N.Y. Apr. 5, 2011).....................................................................17, 23, 28

*Hecht v. Harris, Upham & Co.*,
430 F.2d 1202 (9th Cir. 1970) .................................................................................................26

*Herman v. T. & S. Commodities, Inc.*,
592 F. Supp. 1406 (S.D.N.Y. 1984).............................................................................23, 24, 27

*In re International Management Associates, LLC*,
781 F.3d 1262 (11th Cir. 2015) ...................................................................................1, 2, 6, 12

*Jaksich v. Thomson McKinnon Sec., Inc.*,
582 F. Supp. 485 (S.D.N.Y. 1984)............................................................................................30

*In re John Dawson & Associates, Inc.*,
289 B.R. 654 (Bankr. N.D. Ill. 2003) ......................................................................................29

*JPMorgan Chase Bank, N.A. v. Yuen*,
2013 WL 2473013 (S.D.N.Y. June 3, 2013) .............................................................................8

*Karlen v. Ray E. Friedman & Co. Commodities*,
688 F.2d 1193 (8th Cir. 1982) ...................................................................................21, 25, 26

*In re Klein, Maus &Shire, Inc.*,
301 B.R. 408 (2003)..................................................................................28

*In re Madoff*, (the "*Net Equity Decision*"),
654 F.3d 229 (2d Cir. 2011)........................................................... *passim*

*Merrill Lynch Pierce Fenner & Smith, Inc. v. Cheng*,
901 F.2d 1124 (D.C. Cir. 1990) ...............................................................27

*In re: MF Glob. Inc.*,
2016 WL 270180 (Bankr. S.D.N.Y. Jan. 15, 2016)................................30

*In re MF Global Holdings Ltd.*,
2012 WL 5499847 (Bankr. S.D.N.Y. Nov. 13, 2012) .........................20

*Modern Settings, Inc. v. Prudential-Bache Secs., Inc.*,
936 F.2d 640 (2d Cir. 1991)......................................................................24

*Natl Commc'ns Ass'n Inc. v. AT & T Corp.*,
238 F.3d 124 (2d Cir. 2001)......................................................................18

*Nye v. Blyth Eastman Dillon & Co.*,
588 F.2d 1189 (8th Cir. 1978) ..................................................................23

*In re Old Naples Sec., Inc.*,
311 B.R. 607 (M.D. Fla. 2002) .................................................................16

*Omega Overseas Partners, Ltd. v. Griffith*,
2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014).........................................31

*Paddack v. Dave Christensen, Inc.*,
745 F.2d 1254 (9th Cir. 1984) ..................................................................14

*Parker v. Reda*,
327 F.3d 211 (2d Cir. 2003)........................................................................8

*Romano v. Howarth*,
998 F.2d 101 (2d Cir. 1993).........................................................................9

*Rosenman Family, LLC v. Picard*,
395 F. App'x 766 (2d Cir. 2010) ..............................................................29

*S.E.C. v. F.O. Baroff Co.*,
497 F.2d 280 (2d Cir. 1974).......................................................................15

*Schindler v. Stockley*,
1985 WL 2338 (S.D.N.Y. Aug. 16, 1985), *aff'd*, 788 F.2d 3 (2d Cir. 1986) .........................25

*SIPC v. I.E.S. Management Group, Inc.*,
    612 F. Supp. 1172 (D.N.J. 1985), *aff'd*, 791 F.2d 921 (3d Cir. 1986)..............................18, 19

*SIPC v. Stratton Oakmont, Inc.*,
    229 B.R. 273 (Bankr. S.D.N.Y. 1999) ..............................................................................19, 21

*Stalvey & Assocs., Inc.*,
    750 F.2d 464 (5th Cir. 1985) ...............................................................................................19

*In re Thomson McKinnon Sec., Inc.*,
    191 B.R. 976 (Bankr. S.D.N.Y. 1996)............................................................................23, 26

*U.S. v. Blechman*,
    657 F.3d 1052 (10th Cir. 2011) .............................................................................................9

*United States v. Dreer*,
    740 F.2d 18 (11th Cir. 1984) ...............................................................................................13

*United States v. Freidin*,
    849 F.2d 716 (2d Cir. 1988)...................................................................................................5

*In re Waterscape Resort LLC*,
    544 B.R. 507 (Bankr. S.D.N.Y. 2016)..................................................................................16

*Zervos v. Verizon N.Y., Inc.*,
    252 F.3d 163 (2d Cir. 2001)...................................................................................................4

**Statutes**

15 U.S.C. § 78lll(2)(B)(i)....................................................................................................15, 17

15 U.S.C. § 78lll(11)...........................................................................................................16, 17

Exchange Act Section 29(b) ...............................................................................................30, 31

**Other Authorities**

17 C.F.R. § 300.200 ..................................................................................................................19

17 C.F.R. §§ 300.500 to -300.503 ............................................................................................19

Fed. R. Evid. 801(d)(2) .............................................................................................................21

Fed. R. Evid. 803 ......................................................................................................................10

Fed. R. Evid. 803(6)............................................................................................................ *passim*

Fed. R. Evid. 803(7)............................................................................................................28, 31

Fed. R. Evid. 901(a) ....................................................................................................8

Fed. R. Evid. 1006 ....................................................................................................14

Restatement (Second) of Agency, § 91 ....................................................................23

Aaron Blecker ("Blecker") and Participating Claimants listed on Exhibit A to the Joint Notice of Appeal (collectively, with Blecker, "Participating Claimants"), ECF No. 17884-1 [AA437-AA444], respectfully submit this Reply Brief.

## PRELIMINARY STATEMENT

Reversal is warranted for the following reasons:

1.     The Bankruptcy Court admitted into evidence under the business records exception, FRE 803(6), and relied upon, Greenblatt's testimony and the Trustee's "Principal Balance Calculations" summarizing Madoff's business records dating back to the period from 198 –1997 to hold that Blecker received withdrawals from Madoff during that period.  According to the Trustee, Madoff's business records were "permeated with fraud," and yet the Bankruptcy Court relied solely on these records to reject Blecker's SIPC claim despite the fact that there was not a single piece of third-party documentary evidence indicating that Blecker had ever taken a withdrawal from Madoff:  There was not a single letter from Blecker requesting a withdrawal; there was not a single cancelled check proving that Blecker had received a withdrawal; there was not a single Madoff bank statement listing a check allegedly sent to Blecker – even though Madoff retained such records dating back 20–40 years with respect to other customers.  Moreover, numerous former Madoff employees had admitted that none of Madoff's records were reliable and "everything was false."  *See* Participants Claimants' Principal Brief ("PCX Br.") at 4, n.1, 19-21.

In reaching this extraordinary holding, the Bankruptcy Court relied entirely upon *In re International Management Associates, LLC,* 781 F.3d 1262 (11th Cir. 2015) ("*IMA*"), to justify its admission of the Principal Balance Calculations, despite the crucial distinction that, in *IMA,* the accuracy of the debtor's internal records was proven by contemporaneous third-party records.  *See* PCX Br. at 25, 30, 45-47.  Indeed, the *IMA* Ponzi scheme lasted only eight years, and thus its

records could be – and were – corroborated with reliable third-party evidence.  *See* PCX Br. at 25, 30, 45-47.

We have found no case in the entire country which has applied the business records exception to hold that uncorroborated internal records of a notorious fraudster are admissible to prove transactions that occurred 22–37 years earlier.  Here, unlike in *IMA,* there was not a single third-party record that contradicted Blecker's sworn testimony that he never received a payment from Madoff – even though such third-party records existed for other customers.  The Bankruptcy Court had no basis to make a factual determination that Blecker had received withdrawals when Blecker had consistently denied this and when there was not a single piece of reliable documentary evidence suggesting that Blecker had ever taken a withdrawal.  The Trustee's failure to even attempt to justify the Bankruptcy Court's reliance on *IMA* proves our point:  The Bankruptcy Court had no authority to support the admission of Greenblatt's testimony and the Principal Balance Calculations.

While the Bankruptcy Court held that it had the power to relax the requirements of the FRE in a SIPA liquidation, *see* Order at 16 [AA398], both the Trustee and SIPC have acknowledged that this was error:  the FRE apply in a SIPA liquidation just as they apply in any other federal court proceeding.  *See* Trustee's Br. at 36-37; SIPC's Br. at 20-22.  Thus, there is no justification for the Bankruptcy Court's admission of Greenblatt's testimony and the Principal Balance Calculations.

The Trustee also implicitly concedes that the Bankruptcy Court failed to apply the elements of FRE 803(6).  Trustee's Br. at 43.  Because the Bankruptcy Court misapplied the FRE in admitting Greenblatt's testimony and the Principal Balance Calculations, all of its evidentiary

rulings are subject to *de novo* review.  Once the inadmissible evidence is disregarded, this Court must conclude that the Trustee has failed to prove his case.

2.   The Bankruptcy Court erred as to Blecker's burden of proof.  There is no authority whatsoever to require Blecker, in 2018, to make the impossible negative factual showing that he did <u>not</u> receive the 180 disputed PWs from 1981–1996.  To the contrary, Blecker's only burden is to make the initial legal showing that he is a "customer," which the Bankruptcy Court held that he did.  Having shown that he was a customer with a Net Equity claim of $577,350, it became incumbent on the Trustee to affirmatively prove that Blecker's Net Equity should be reduced by the alleged PWs.  In every single case where the trustee or debtor sought to reduce a claim based on alleged withdrawals, the burden was on the trustee or debtor to prove receipt of those withdrawals, just as it would be the trustee's or debtor's  burden to prove the analogous affirmative defenses of offset and recoupment.  The Trustee did not meet that burden.

3.   The Bankruptcy Court flouted hornbook law in holding that Blecker's customer agreements, purportedly executed no earlier than November 1992, could retroactively ratify pre-1992 transactions.  The Trustee has no answer for this, and instead he argues, incorrectly, that Participating Claimants waived this argument.  The Trustee's position is demonstrably incorrect because Participating Claimants made this argument clearly and unequivocally below.

Moreover, with respect to all of the PWs, even those occurring after November 1992, Blecker could not be said to have ratified them because the PWs were not indicated as checks sent to him (on the contrary, the statements seem to indicate a check sent to a corporation) and because Blecker did not have the necessary facts to ratify the transactions.  Moreover, the doctrine of ratification is inapplicable because Blecker does not allege unauthorized trading; and the *legal* doctrine of ratification cannot be used to resolve against Blecker the antecedent *factual* question

of *whether* Blecker received the PWs in the first place.  For all of these reasons, reversal is warranted.

**FACTUAL OVERVIEW**

Participating Claimants rely on and incorporate by the reference the facts set forth in their Principal Brief.

**ARGUMENT**

**I.    The Trustee did not introduce any admissible evidence to prove that Blecker's Net Equity should be reduced by the 180 PWs**

After Blecker clearly made his *prima facie* showing that his Net Equity was $577,350, it was the Trustee's burden to prove a reduction to that calculation based on the receipt of the alleged PWs.  The Trustee did not do so because he introduced no admissible evidence.  To the extent the Bankruptcy Court admitted hearsay to allow the Trustee to make this showing, this was reversible error.

**A.    The Trustee implicitly concedes that the Bankruptcy Court erred in relaxing the FRE simply because this was a SIPA proceeding**

All of the Bankruptcy Court's evidentiary rulings regarding the admissibility of the BLMIS books and records are subject to *de novo review* because the Bankruptcy Court impermissibly relied on SIPA to relax the books and records exception to the FRE.  *See In re Madoff*, 654 F.3d 229, 234 (2d Cir. 2011) (the "*Net Equity Decision*") ("interpretation of SIPA" is a legal conclusion reviewed *de novo*); *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (court necessarily abuses its discretion by basing ruling on erroneous view of the law or misapplication of relevant legal principles).

The Bankruptcy Court held that "[i]n ruling on the objections, it is necessary to bear in mind that a SIPA trustee must make payments to customers based on their net equity 'insofar as the amount owed to the customer is 'ascertainable from the books and records of the debtor . . .'"

Order at 16 [AA398]  (citation omitted); *see* Order at 22 [AA404] (overruling relevancy objection because "[a]s stated, the purpose of this SIPA proceeding is to determine the net equity obligations to the extent ascertainable from the BLMIS books and records"); *see also* Order at 4 [AA386] (reciting the "books and records" language).

None of the cited SIPA provisions permits a SIPA trustee to ignore the FRE.  The law is to the contrary.  The Trustee and SIPC agree that the FRE apply strictly in a SIPA proceeding as in any other proceeding.  *See* Trustee's Br. at 36-37; SIPC's Br. at 20-22.

According to the Bankruptcy Court, if the Trustee may ascertain Net Equity based on the debtor's books and records, then those books and records should be admitted more readily than they otherwise would be.  This is why it recited the Trustee's statutory obligation with respect to the debtor's books and records in ruling on Blecker's evidentiary objections.  *See* Order at 16 [AA398] (**"*In ruling on the objections*__**, it is necessary to bear in mind that a SIPA trustee must make payments to customers based on their net equity 'insofar as the amount owed to the customer is 'ascertainable from the books and records of the debtor . . .'") (citation omitted) (emphasis added); *see also* Order at 22 [AA404] (overruling relevancy objection by citing to the "books and records" language).  There is no other way to interpret the Bankruptcy Court's language.

B.  The Trustee concedes that the Bankruptcy Court did not consider all of the elements of FRE 803(6)

The Bankruptcy Court's failure to apply the elements of the business records exception, *see* Order at 23-26 [AA405-8], was an error of law requiring *de novo* review.  Courts "must respect" Congress by applying each and every element of the business records exception before admitting evidence under that exception.  *See United States v. Freidin*, 849 F.2d 716, 723 (2d Cir. 1988) (cited by the Trustee's Br. at 42) (reversing and remanding because the court admitted a

record under FRE 803(6) without analyzing whether the record was made pursuant to a "regular practice" of the business). It is reversible error not to do so. *See id*.

Here, the Trustee does not seriously address the fact that the Bankruptcy Court did not apply the elements of FRE 803(6). Instead, the Trustee cursorily argues that "the bankruptcy court found (1) that the BLMIS records were previously found to be trustworthy for the purposes of calculating net equity; and (2) that the employee testimony met each of the elements of Rule 803(6) because the employees had firsthand knowledge of BLMIS's record-keeping practices, how BLMIS created the books and records in the course of its business, and how the PW notations were recorded contemporaneously." Trustee's Br. at 43. Of course, the Trustee ignores the consistent testimony of former BLMIS employees that the BLMIS books and records were unreliable. *See* PCX Br. at 19-21. The testimony of the Trustee's expert, Lisa Collura, proves that even the Trustee understood that he could not rely upon Madoff's or BLMIS' records; instead, he could only rely upon records that Collura was able to "reconcile" to reliable third-party records. PCX Br. at 3, 6, 15-17.

Despite Collura's testimony that she could only "reconcile" Madoff's records with third-party records and there were no third-party records indicating that Blecker received a single check from Madoff, the Bankruptcy Court never considered whether the burden shifted back to the Trustee because Blecker established the unreliability of Madoff's records. FRE 803(6) (business records not admissible if the opponent "show[s] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness"). The Trustee does not address this. Instead, the Bankruptcy Court simply relied on *IMA* for its unprecedented holding, but *IMA* is completely distinguishable on its facts, which the Bankruptcy Court ignored.

Further, if, as the Trustee suggests, the Bankruptcy Court "found that the BLMIS records were *previously* found to be trustworthy for the purposes of calculating net equity," Trustee's Br. at 43 (emphasis added), then the Trustee is implicitly admitting that the Bankruptcy Court committed reversible error. The Second Circuit's *Net Equity Decision* did not make factual findings in individual cases; those findings were deferred for litigation in separate proceedings such as the proceeding below. If that were not the case, the Bankruptcy Court would never have engaged in the profit withdrawal proceeding at all.

C. FRE 803(6) is not satisfied by records of unknown authorship, where the source of information recorded on the BLMIS records is an admitted fraudster

Had the Bankruptcy Court actually applied FRE 803(6), it would have inevitably concluded that the Trustee could not introduce summaries of a mass of Madoff customer statements and internal Madoff documents. The proponent of a business record's admissibility must, as a threshold matter, demonstrate that the information therein was recorded by a reliable source. To be admissible the source of the information must have made the notations (1) "at or near the time" of the event; and (2) must have firsthand knowledge of the event or made the record based on information supplied by someone with knowledge acting in the ordinary course of business. FRE 803(6). No former Madoff employee could identify the author of the PW notations on customer statements, and only Bongiorno could speculate as to who made the "S" or "R" notations or when. *See* PCX Br. at 18-19. Bongiorno testified that the "S" might have meant that Madoff – not Blecker – wanted the account to be a "Send" account. *See* Bongiorno Tr. at 86:19-87:14, 105:5-106:10, 221:17-20, 225:14-16. Bongiorno testified that there was no regular business practice for recording the date a form was marked "S" or "R" and there were notations made on Blecker's "piece of ledger paper" of unknown authorship, some of which she could not understand. *Id.* at

221:17-226:24. Therefore, the authors did not have firsthand knowledge of the information they were entering, or when it was entered. But the Bankruptcy Court admitted the evidence anyway.

Courts applying FRE 803(6) have stressed that the "trustworthiness" of the information is the "principal precondition to admissibility." *See* PCX Br. at 38-40. It is the satisfaction of the elements of FRE 803(6) that permits an inference of reliability. While some courts have found, in specific instances, that particular documents satisfy this trustworthiness requirement even though the proponent could not identify the author or date of the entry, they have always required other indicia of reliability and trustworthiness for admission. PCX Br. at 38-40.

Here, the Trustee himself admitted that Madoff's records were unreliable, that they were "permeated with fraud." And the former Madoff employees who prepared the records consistently testified that Madoff's records were unreliable. PCX Br. at 19-21. They confirmed that the only reliable evidence would be a letter from a customer requesting a PW. PCX Br. at 21; *see also* Leung Tr. at 132:19-24 ("[E]verything was false, yeah."). Here, there is not a single piece of third-party evidence that Blecker ever requested or received a withdrawal.

The Trustee argues that "the admissibility of BLMIS books and records does not require the testimony of the document's author to demonstrate its authenticity." Trustee's Br. at 38; *see also id*. at 38-40.[1] But Participating Claimants do not challenge the authenticity of the BLMIS books and records under FRE 901(a). The Trustee's failure to identify the authors of the "PW" notations on customer statements and the "S" and "R" notations means that those documents could

---

[1] The Trustee also cites *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003), for this proposition, *see* Trustee's Br. at 42, but the cited portion does not concern FRE 803(6). The Trustee further cites *JPMorgan Chase Bank, N.A. v. Yuen*, 2013 WL 2473013 (S.D.N.Y. June 3, 2013), to argue that it is not necessary, under FRE 803(6), to know the author of each document. Trustee's Br. at 42. However, in *Yuen*, the court admitted the document because its accuracy was relied on by the company and the author had no incentive to falsify or misrepresent. *Id*. at *6-7.

*only* be admitted under 803(6) if there was some witness who, as required by FRE 803(6)(D), could demonstrate that the elements of FRE 803(6)(A)-(C) were met. *See* PCX Br. at 38-39; *see also* FRE 803(6)(E). Here, there are no other guarantees of trustworthiness, and neither the Bankruptcy Court nor the Trustee addressed this.

Moreover, the fact that Madoff himself was the underlying source of the instruction to enter "S" or "PW" and that such instructions were supplied third hand to the author vitiates the notion that the entries were made from firsthand knowledge in the ordinary course of business. *See* Order at 12 [AA394]. ("Madoff would . . . instruct Ms. Bongiorno of the decision and direct her to memorialize it in the customer's account file with an appropriate notation."). Records must be excluded if *"if the source of the information* or the method or circumstances of preparation indicate a lack of trustworthiness." FRE 803(6)(E) (emphasis added). Few sources are more unreliable than Madoff.

Even if Madoff can somehow be deemed a reliable source – which would be an unprecedented holding – to satisfy the "essential link" between the informant and the author, the Trustee must also show that the source of the information – Madoff – was complying with a business obligation to convey true and accurate statements. *See*, *e.g.*, *Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993). If the supplier of the information does not act in the regular course of business, "'then an essential link in the trustworthiness chain fails.'" *U.S. v. Blechman*, 657 F.3d 1052, 1066 (10th Cir. 2011) (citation omitted); *see also* 803(6)(E) (records excluded "if the method or circumstances of preparation indicate a lack of trustworthiness"). The Trustee does not even attempt to deal with this.

Where, as here, the Trustee claims that the recorded trades that ostensibly produced the "profits" were entirely fictitious and intended to perpetuate a fraud, he is not entitled to the

conflicting presumption that Madoff supplied accurate information concerning the customers' accounts to those who entered the notations on Madoff's records. *See* FRE 803, advisory committee's note ("If . . . the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail.").

D. The Trustee does not even address the fact that Madoff did not maintain regular practices

It was error for the Bankruptcy Court to admit the BLMIS books and records without even considering whether BLMIS maintained regular practices – which it did not. *See* FRE 803(6)(B),(C) (imposing the requirements that "record was kept in the course of a regularly conducted activity of a business" and that "making the record was a regular practice of that activity"). Bongiorno testified that BLMIS had a "different story" every five to ten years. Bongiorno Tr. at 15:7-20. For instance, during one unidentified period, Madoff decided to make all new accounts "Send" accounts. Bongiorno Tr. at 35:1-9. Bongiorno testified that accounts could be designated as "Send" accounts even without the customer requesting it. Bongiorno Tr. at 106:8-10 ("[An 'S' would mean] I guess she – they wanted their check or Bernie wanted to send them a check. I don't know. Whatever.").

Madoff's practices were ***irregular*** because they were not followed. The Trustee, the Bankruptcy Court, and Blecker all agree that it was Madoff's policy to require a customer to send a written request to change a "Send" account to a "Reinvest" account, and *vice versa.* See Trustee's Br. at 8; Order at 13 [AA395]. Although the Trustee alleges that Blecker stopped receiving PWs in 1997, ***the Trustee has no letter from Blecker requesting that his account be changed from an "S" account to an "R" account.*** *See, e.g.*, Tr. at 217:2-8, 226:6-9. This fact alone is dispositive in proving that Madoff did not maintain regular practices generally, and specifically with respect to Blecker.

The evidence further reveals that BLMIS changed its accounting policies and did not follow internal guidelines for reporting. Indeed, the Trustee's professionals admitted that they found hundreds of errors in their review. *See* PCX Br. at 42-43. For example, with respect to the PW notations, the House 17 Manual directs the employee to write PW "[o]n description type 'check & stock name.'" TX080 at MADTSS00336545. However, BLMIS employees regularly failed to follow these instructions, and the Trustee's experts included many non-conforming transactions as PWs. *See* PCX Br. at 43.

Similarly, the Trustee's professionals admitted that they found conclusive evidence that 800 PW notations represented checks to customers that were not cashed. Tr. at 231:7-232:8. Employees gave Madoff PW checks directly on occasion, trusting Madoff to give the checks to the client personally. Jackson Tr. at 110:19-110:25. Based on the Trustee's failure to produce a single cancelled check allegedly sent to Blecker, all of Blecker's PW transactions could have involved checks made payable to a Madoff employee. Moreover, the Trustee's professionals continue to uncover errors. *See* Tr. at 232:3-23.

There were numerous other mistakes and instances where a customer statement contained a "PW" but the customer did not receive the alleged PW check. To take just one example, a customer statement for Gunther Unflat deducted $4,226.20 from the account on the basis of an alleged PW, *see* PCX049, but the customer never cashed that check. *See* PCX048. When asked, Collura admitted that she would have no way to verify whether the check was ever cashed without seeing a cancelled check or the customer's personal account records, and she had neither for this transaction. Tr. at 153:24-154:12. In Blecker's case, of course, the Trustee does not have a single check allegedly made payable to Blecker. Therefore, he has no way of knowing if, in fact, checks were made payable to Blecker and, if so, whether they were cashed by Blecker or, instead, cashed

by a dishonest employee.  Thus, the irregularity of Madoff's business practices and records precludes introduction of the BLMIS records under FRE 803(6).  The Trustee has no answer for any of this.

E.  The Trustee does not seriously dispute that the Bankruptcy Court's unprecedented decision cannot be supported by *IMA*

Rather than actually applying the FRE, the Bankruptcy Court relied on *IMA* to hold that, because summary exhibits were admissible there, and because that case involved a financial fraud, then summaries of Madoff records could similarly be admitted for their truth.  781 F.3d 1262 (11th Cir. 2015).  However, neither the Bankruptcy Court, nor the Trustee, has been able to deal with the pivotal distinction in *IMA* that the debtor's books and records were confirmed by reliable, third-party documents.  *See* PCX Br. at 25, 30, 45-47.

Here, on the other hand, the Bankruptcy Court has relied upon the debtor's internal records which were "permeated with fraud," and the Bankruptcy Court has ignored the fact that there is not a single piece of third-party evidence that Collura could find to "reconcile" the alleged Blecker withdrawals.  The Trustee has not even attempted to explain the basis on which the Bankruptcy Court could rely upon *IMA* as support for its admission of Madoff's business records that were permeated with fraud.

F.  The Bankruptcy Court failed to consider that Participating Claimants made a showing of untrustworthiness under FRE 803(6)(E)

The Bankruptcy Court did not even consider whether Participating Claimants showed that the source of information or the method or circumstances of preparation indicate of lack of trustworthiness.  *See* FRE 803(6)(E) (hearsay is only admitted under FRE 803(6) if "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness").  This was legal error and the Bankruptcy Court could not rely on previous findings from the *Net Equity Decision* made without the benefit of discovery or a

plenary hearing. The Trustee is really arguing that records prepared on uncorroborated information provided by Madoff are reliable as a matter of law.

However, documents prepared in order to deceive are inherently unreliable. PCX Br. at 26. Further, when considering whether a document was prepared by an untrustworthy source, courts examine whether the party providing the information had an incentive to misrepresent. *See* PCX Br. at 44-45. Here, as the Trustee represented, *inter alia*, to the Second Circuit, Madoff, a notoriously untrustworthy source, had a motive to misrepresent and his records reflected fictitious transactions. *See also United States v. Dreer*, 740 F.2d 18, 20 (11th Cir. 1984) (rejecting a set of business records on the grounds that other records in the business were falsified). Under these circumstances, Madoff's records are inadmissible.

Unlike legitimate businesses that rely on accurate records to maintain profitability and avoid regulatory issues, the *inaccuracy* of Madoff's records was integral to the survival of Madoff's fraud. As the Trustee represents, Madoff misled innocent customers to hide the fact that no trades were occurring and the customer was not actually making any return. This incentive to misrepresent disqualifies the Madoff records under FRE 803(6). The Bankruptcy Court did not even consider this, despite being required to do so.

### G. Other customer statements are irrelevant

The Bankruptcy Court permitted the Trustee to rely on documents relating to the accounts of customers *other* than Blecker, many of whom do not dispute receiving PWs, during time periods *other than* those in which the Bleckers were alleged to have received PWs (and during which Madoff employed a *different* trading strategy). Order at 22 [AA404]. These documents were

irrelevant and inadmissible. Whether Blecker received any checks from Madoff is not a statistical issue; it is a factual issue. *See* PCX Br. at 35-36.[2]

In arguing that documents relating to other customers in other time periods are relevant, the Trustee makes the same mistake the Bankruptcy Court did: that the FRE can be relaxed because this is a SIPA Proceeding. *See* Trustee's Br. at 40. ("Claimants' argument ignores the mandates of a SIPA case. . . . . [A] SIPA trustee determines customer claims by looking at the books and records of the debtor to ascertain a claimant's net equity."); *id*. at 41 ("[T]he Trustee's determination . . . is based on the BLMIS books and records *in toto*."). And although the Trustee argues that the Bankruptcy Court's determination of relevance is reviewed for abuse of discretion, Trustee's Br. at 41, the Bankruptcy Court's holding, is based on an interpretation of SIPA, and a misapplication of the FRE, and thus is subject to *de novo* review. *See Net Equity Decision*, 654 F.3d at 234 (bankruptcy court's "interpretation of SIPA" is a legal conclusion reviewed *de novo*).

### H. The Principal Balance Calculations were inadmissible

The Trustee ignores the fact that Participating Claimants' objected to the Principal Balance Calculations because they summarize a mass of inadmissible hearsay. *Compare* Trustee's Br. at 45 *with* PCX Br. at 17, 24-25, 29-30, 45-47; *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1260 (9th Cir. 1984). Therefore it was reversible error to admit them under FRE 1006. Additionally, because some of the documents the Principal Balance Calculations purported to summarize were illegible, they are inadmissible. *See* FRE 1006 (underlying documents must be

---

[2] Collura was able to reconcile only 51,769 of the 91,132 total PW transactions found in all BLMIS records. PCX Br. at 16. The vast majority that she could reconcile occurred in the ten-year period from December 1998-December 2008 (the "Ten-Year Period"), during which Madoff was not doing arbitrage trading. Instead, Madoff was doing a "split strike conversion," which did not generate PW entries on the customer statements. With respect to the period prior to the Ten-Year Period – the only period applicable to Blecker – Collura was able to reconcile only 54% of the PWs and, of that 54%, the majority were transactions of a Madoff co-conspirator. PCX Br. at 16.

made available to opponent); [AA317-18], ¶¶ 11-14, 16; *see also id.*, Exs. M-P [AA375-82]; Tr.

at 200:25-201:21.  The Trustee does not challenge this on appeal.

## II. It is not Blecker's burden to affirmatively make the impossible factual showing that he did not receive each of the 180 alleged PW checks during the period from 1981–1996

### A. Blecker is a customer as a matter of law

The Trustee argues that SIPA imposes the impossible burden on Blecker to make the

factual showing that he did not receive 180 separate PW checks from Madoff during the period

from 1981–1996.  Trustee's Br. at 26-28 (arguing that "a SIPA claimant has the burden to prove

his or her 'net equity,' the net amount owed to the customer by the broker" and "Blecker must

provide evidence on both the amount he deposited with BLMIS ***and that he did not withdraw the***

***PW Transactions from his accounts***.") (emphasis added).  This is incorrect as a matter of law.  It

is only Blecker's burden to initially prove that he is a "customer," which he indisputably did.  *See*

Order at 33 [AA415].  The Trustee, like the Bankruptcy Court, conflates Blecker's burden to prove

that he is a customer with Blecker's burden to make a *prima facie* showing of his Net Equity.

A claimant bears the initial burden of establishing that he is a customer and has a claim

against the customer property pool.  *See S.E.C. v. F.O. Baroff Co.*, 497 F.2d 280, 282 (2d Cir.

1974).  This burden is a light one:  customer status is established simply by showing that the

claimant "'deposited cash with the debtor for the purpose of purchasing securities.'"  *See In re*

*Madoff*, 654 F.3d 229, 236 (2d Cir. 2011) (the "*Net Equity Decision*") (quoting SIPA §

78lll(2)(B)(i)); *see id.* at 236 ("[T]he critical aspect of the 'customer' definition is the entrustment

of cash or securities to the broker-dealer for the purposes of trading securities.").  Here, it was

undisputed that Blecker was a customer, and the deposits in the Blecker Accounts were stipulated

to equal $577,350.  *See* Order at 33 [AA415].  Thus, Blecker made a *prima facie* showing that his

Net Equity is $577,350.  Having established this, it became incumbent on the Trustee to

affirmatively prove that Blecker's Net Equity should be reduced based on alleged PWs. The Trustee did not do this, and the Bankruptcy Court committed reversible error by imposing on Blecker the burden to establish that he did not receive each PW check that the Trustee alleges he received, although the Trustee does not have a single piece of reliable evidence to support that contention. *See* Order at 33 [AA415].

In those cases in which a SIPA trustee sought to offset a claimant's Net Equity based on the receipt of withdrawals, the burden has always been on the trustee to prove those withdrawals. *See In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 555, 555 n.161 (Bankr. S.D.N.Y. 2002) (burden on trustee to prove withdrawals); *In re C.J. Wright & Co. Inc.*, 162 B.R. 597, 604 (Bankr. M.D. Fla. 1993) (even if a claimant is a "customer," the claimant's Net Equity claim may be reduced if the trustee establishes the amount of payments received by the claimant prior to the commencement of the case).

The Trustee's assertion that Blecker received PWs is analogous to any bankruptcy proceeding in which the debtor asserts the affirmative defenses of setoff or recoupment. *In re Old Naples Sec., Inc.*, 311 B.R. 607, 616 (M.D. Fla. 2002) (referring to reductions in claimants' Net Equity based on interest payments received by claimants from the debtor as an "offset for payments" and indicating that it is the debtor's burden to establish its affirmative defenses); *In re Waterscape Resort LLC*, 544 B.R. 507, 527 (Bankr. S.D.N.Y. 2016) (analyzing debtor's affirmative defenses of setoff and recoupment to determine whether debtor met burden of establishing those affirmative defenses);

The Trustee cites SIPA § 78lll(11) to argue that Blecker must prove "that he did not withdraw the PW Transactions from his accounts." Trustee's Br. at 27. However, this section of SIPA is merely the "Definitions" section and the cited portion merely defines the term "Net

Equity." SIPA § 78lll(11). Nothing in SIPA's definition of "Net Equity" supports the Trustee's argument.

B. The Trustee conflates "customer" status and "Net Equity"

By arguing that it is Blecker's burden to prove "that he did not withdraw the PW Transactions from his accounts," the Trustee is conflating Net Equity and "customer" status. *See* Trustee's Br. at 27. In reliance on this argument, the Bankruptcy Court improperly collapsed "customer" status and Net Equity so that the burden to prove customer status and the burden to *disprove* receipt of alleged reductions to Net Equity were both on Blecker. *See* Order at 33 [AA415]; *id.* at 3 [AA385] (it was Blecker's burden to "prov[e] the amount of his claim"). This was wrong as a matter of law.

The plain text of SIPA, as recognized by the *Net Equity Decision*, makes clear that "customer" status and Net Equity are separate matters. *See* 654 F.3d at 236 (citing SIPA § 78lll(2)(B)(i)) (customer status is established simply by showing that the claimant deposited cash with a broker for the purpose of purchasing securities). The *Net Equity Decision* expressly held that an investor could be a "customer" but have a negative Net Equity. *See* 654 F.3d at 236 ("[W]hile the BLMIS customer statements confirm that the BLMIS claimants are properly treated as customers with claims for securities, the last customer statements are not useful for ascertaining 'net equity.'"); *In re Great E. Sec., Inc.*, 2011 WL 1345152, at *8 (S.D.N.Y. Apr. 5, 2011) (a "customer" can have a negative Net Equity because he owes the debtor money). "Customer" and "Net Equity" are defined separately under SIPA, and they are separate inquiries.

C. The cases cited by the Trustee do not establish that it is Blecker's burden to affirmatively disprove receipt of each of the 180 PWs

In arguing that Blecker is required to prove not just his status as a "customer" but also "the amount owed to him by the debtor," the Trustee cites a series of irrelevant and inapposite cases.

In fact, there is no case in the country of which we are aware that would require Blecker to make such a showing. *See Natl Commc'ns Ass'n Inc. v. AT & T Corp.*, 238 F.3d 124, 131 (2d Cir. 2001) ("[C]ourts should avoid requiring a party to shoulder the more difficult task of proving a negative. The general rule is that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim.") (citation omitted).

The Trustee cites *SIPC v. I.E.S. Management Group, Inc.*, 612 F. Supp. 1172, 1177 (D.N.J. 1985), *aff'd*, 791 F.2d 921 (3d Cir. 1986), Trustee's Br. at 26, but all this case held was that limited partners were not "customers" under SIPA with respect to the liquidating general partner because the liquidating general partner was not holding limited partnership interests in its capacity as a broker-dealer. *See* 612. F. Supp. 1178 ("[I]n reality, their gripe is with the general partner . . . no longer acting as a broker-dealer but as a general partner . . . ."). This case is completely irrelevant.

*In re A.R. Baron Co., Inc.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998), Trustee's Br. at 26, simply held that where a liquidating broker failed to execute a sell order prior to the filing date, the claimant's Net Equity claim could not be augmented to include the amount of cash proceeds which would have been generated by such a sale. 226 B.R. at 795-96. Although this case stated, in passing, that it was the customer's burden to establish that his Net Equity should include the cash that would have been in his account had the sales been executed, this aspect of the customer's claim was decided against the customer based on reference to federal rules and regulations, *i.e.*, as a matter of law. Thus, there is nothing about this case that can be read to mean that a customer must affirmatively disprove, as a factual matter, receipt of hundreds of alleged withdrawals, occurring decades ago, that the debtor asserts should reduce the creditor's *prima facie* showing of Net Equity. If anything, this case suggests that, if the Trustee desires to reduce a customer's Net

Equity based on what the Trustee alleges "should have been in the account," *id*. at 795, it is the Trustee's burden to do so.

The Trustee cites *SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 277 (Bankr. S.D.N.Y. 1999), which held that the claimants did not have "customer" claims under SIPA because: (a) the liquidating broker did not clear their trades and, therefore, the claimants did not entrust the broker with securities; and (b) the claims against the liquidating broker were effectively claims for failure to execute, which are not customer claims under SIPA. 229 B.R. at 279-80 (citing 17 C.F.R. § 300.200, which provides that the claimants were customers of the clearing firm, rather than the liquidating broker-dealer and SIPC "Rules Relating to Satisfaction of a 'Claim for Cash' or a 'Claim for Securities'," 17 C.F.R. §§ 300.500 to -300.503, which provides that a failure-to-execute claim is a general unsecured claim).

Contrary to the Trustee's suggestion, this case did not deny Net Equity claims by requiring a defrauded investor to make a nearly impossible *factual* showing. To the contrary, customer status is a question of law. *See Stalvey & Assocs., Inc.*, 750 F.2d 464, 468 (5th Cir. 1985).

The Trustee cites *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 557 (S.D.N.Y. 2002), where "customer" status was denied because the claimant had been the knowing beneficiary of fraudulent transactions, market manipulation, other illicit schemes, the profits of which constituted the corpus of the account for which he claimed customer status. *Id*. at 562. The court held it would subvert public policy to allow this claim. *Id*. at 557-563. To the extent the court imposed any burden on the claimant, it was merely the initial burden to show "whether the account qualifies for SIPA in the first place," *i.e.*, that the claimant was not seeking SIPA protection for illicit transactions in which he was a knowing participant. *See id*. at 559, n.164.

In *Adler, Coleman,* the trustee argued that "customer" status should also be denied because, if not for the illicit transactions, the claimant's account would have a negative balance because the claimant made "massive withdrawals." *Id.* at 555. The court did not require the claimant to *disprove* those withdrawals, but instead required the trustee to prove the amount of those withdrawals. *See Id.* at 555, 555, n.161. Thus, the lesson from *Adler, Coleman* is clear: a SIPA trustee has the burden of proving withdrawals.

The Trustee cites *In re MF Global Holdings Ltd.*, 2012 WL 5499847 (Bankr. S.D.N.Y. Nov. 13, 2012), Trustee's Br. at 27, but *Mf Global* merely provides an example of the rules regarding the relative burdens of proof in claims against the general estate. 2012 WL 5499847, at *3. It does not concern any priority claims for SIPC insurance and says nothing about the relative burdens of proof in such a case.

D. The cases cited by the Trustee concerning customer status "in the air" are completely inapplicable

The Trustee argues that "Claimants' assertion that their only burden was to prove 'customer' status fails because . . . there is no such thing as customer status 'in the air.'" Trustee's Br. at 27. However, this is completely irrelevant: no one disputes that Blecker is a customer with respect to all of the transactions in the Blecker Accounts. The cases cited by the Trustee demonstrate the irrelevancy of the Trustee's argument. They merely illustrate that if a broker is not acting in his capacity as a broker, but in some other capacity, such as a borrower, the claimant cannot make a SIPA claim against the broker. *See* Trustee's Br. at 27.

The Trustee cites *In re Adler, Coleman Clearing Corp.*, 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997), for the proposition that "claimants must show they are 'customers' and amounts in their accounts are 'customer property.'" Trustee's Br. at 27. However, the Trustee omits the sentence following his quote, which is that "[t]o do so, they must show both that they meet SIPA's

definition of customer and that they entrusted their assets to debtor as a broker-dealer to trade them in the securities market." *In re Adler Coleman Clearing Corp.*, 204 B.R. at 115. Blecker has met his burden. It is not his burden to prove he did not receive 180 checks from Madoff during the period from 1981–1996.[3]

E. The Trustee is seeking to relitigate a holding of the *Net Equity Decision*

Although the Trustee argues that Blecker is attempting to relitigate the *Net Equity Decision*, Trustee's Br. at 36, the complete opposite is true. As previously argued, PCX Br. at 10, 27, 34-35, 53, it is the Trustee who is relitigating the *Net Equity Decision* because the Second Circuit clearly held – in accordance with the plain text of SIPA – that customer status is established simply by showing that the claimant deposited cash with a broker for the purpose of purchasing securities. *See Net Equity Decision*, 654 F.3d at 236. Here, Blecker clearly and indisputably established his customer status and the Trustee admitted that Blecker entrusted $577,350 to Madoff for the purpose of purchasing securities. PCX023 at 3; PCX017 at 4, PCX015 at 2. *See* FRE 801(d)(2).

Blecker is not relitigating the Trustee's selection of the Net Investment Method. Rather, Blecker is explaining that "[i]f the Trustee had not selected the Net Investment Method for calculating Net Equity, then the Trustee would merely need to honor net equity claims based on the customer's last statement balance." PCX Br. at 34. The Trustee must live with the consequences of his unprecedented selection of the Net Investment Method, including any evidentiary problems presented by such a decision. *See Karlen v. Ray E. Friedman & Co.*

---

[3] The Trustee also quotes *Stratton Oakmont, Inc.*, 229 B.R. at 277, which stated "[a]n investor can be a customer vis-à-vis certain transactions but not others." Trustee's Br. at 28. However, this was dicta, had nothing to do with the facts of that case, and is completely irrelevant here. The Trustee also argues that Claimants "state, without citation, that the Trustee had the burden to prove that Blecker received his withdrawals." Trustee's Br. at 27 (citing PCX Br. at 29). However, the Trustee ignores the numerous instances where Blecker cited authority for the proposition that Blecker's only burden is to make an initial showing of customer status. *See, e.g.*, PCX Br. at 9-10, 26-27, 53.

*Commodities*, 688 F.2d 1193, 1202 (8th Cir. 1982) ("[O]ne whose . . . conduct has rendered difficult the ascertainment of the precise damages suffered is not entitled to complain of the difficulty of exact computation.").

## III.   Blecker did not ratify the PW Transactions

The Bankruptcy Court's holding that Blecker "ratified" the PWs is deeply flawed.

### A.   The Trustee concedes that November 1992 contracts do not ratify pre-November 1992 PWs

The two Customer Agreements cited by the Bankruptcy Court as the basis for its ratification holding were purportedly executed in November 1992 (when Blecker was 81 years old).  Order at 31 [AA413] (citing TX045 at 28, TX049 at 11).  It is hornbook law that these customer agreements cannot retroactively ratify alleged PWs that predate the agreements.  *See* PCX Br. at 48.  The Trustee does not dispute this.

The Bankruptcy Court did not even address this fatal problem and its holding that the Customer Agreements could ratify ***all*** the PWs was reversible error.  If the pre-1992 PW transactions are not counted as reductions to Blecker's net equity, then Blecker has a positive Net Equity and, at minimum, this matter should be remanded for a calculation of his Net Equity.

### B.   Participating Claimants expressly argued below that the Customer Agreements were not executed until November 1992

Rather than confronting the obvious problems with the Bankruptcy Court's ratification holding, the Trustee simply argues – incorrectly – that Blecker has waived this argument by arguing it for the first time on appeal.  *See* Trustee's Br. at 34.  Blecker set forth this argument plainly and unequivocally below.  *See* ECF No. 17398, ¶ 176 ("As an initial matter, the two customer agreements relied on by the Trustee in support of this argument were purportedly executed in November 1992, which was over a decade after the Trustee alleges Blecker received any purported profit withdrawals.  These customer agreements obviously cannot retroactively

ratify alleged profit withdrawals that pre-date the agreements.") (internal citations omitted). Blecker could hardly have made this argument more clearly.

C. <u>The doctrine of ratification does not apply and Blecker could not have ratified the PWs</u>

The Trustee fails to explain why the doctrine of ratification should apply at all. It is the Trustee's burden to prove this affirmative defense by showing "'a clear and unequivocal adoption of [the] trade by the customer.'" *Herman v. T. & S. Commodities, Inc.*, 592 F. Supp. 1406, 1417-18 (S.D.N.Y. 1984) (alteration in original) (citation omitted); *id.* (requiring "full knowledge of the facts" and "a true picture of trading").

Ratification could not have occurred here because Blecker was not aware of all of the relevant facts surrounding the PWs. This is dispositive. *See In re Great E. Sec., Inc.*, 2011 WL 1345152, at *6 (ratification requires **the investor to "kn[o]w the pertinent facts surrounding the transaction and manifest[] a clear intent to approve it."**) (emphasis added); *In re Thomson McKinnon Sec., Inc.*, 191 B.R. 976, 988 (Bankr. S.D.N.Y. 1996) ("[C]ustomer's assent must be given voluntarily and intelligently with full knowledge of the facts."); *id.* at 989 (it would subvert public policy to punish customers when brokers "use their superior knowledge of the financial markets to enhance their wealth at the expense of their customers"); *Evanston Bank v. Conticommodity Servs., Inc.*, 623 F. Supp. 1014, 1034 (N.D. Ill. 1985) ("[R]atification may be inferred from silence only when the principal has full knowledge of all material facts.") (citing Restatement (Second) of Agency, § 91) (principal cannot ratify if he is "ignorant of material facts involved in the original transaction"); *id.* at 1037 ("'[I]t would be 'a strange twist of the law that would permit the party with knowledge of the facts to estop the party without knowledge.'") (citation omitted); *see also Nye v. Blyth Eastman Dillon & Co.,* 588 F.2d 1189, 1197 (8th Cir. 1978) ("An effective ratification requires that a party be put on notice as to the true state of affairs.

. . . [T]he misrepresentations and omissions were continuing in nature and included the actual inducement to ratify.").

Here, Blecker did not know the pertinent facts surrounding the transactions: he thought the PWs represented checks to corporations for the purchase of their shares – as anyone would think by looking at the statements. *See* PCX Br. at 27-28, 51; PCX018; TX082; TX206; TX228.

The PW notations followed this form: "CHECK PEP BOYS," and they were listed on statements littered with fictitious debits and credits. *See, e.g.*, TX206. Indeed, it was not until after Blecker's counsel demanded copies of the checks to the corporations indicated that the Trustee confessed that the checks were not payable to the corporations. ECF No. 14162-42. Blecker did not know that Madoff was a fraud, he did not know that each PW entry represented a check that should have been paid to him; he never received a check from Madoff; and he never informed Madoff that he wanted to receive checks. Thus, Blecker did not manifest a clear intent to take withdrawals. On the contrary, he never to Madoff asking for a withdrawal. It was reversible error for the Bankruptcy Court to hold that Blecker ratified the PWs. *See Herman v. T. & S. Commodities, Inc.*, 592 F. Supp. 1406, 1419 (S.D.N.Y. 1984) (ratification inapplicable because "[d]efendants have not successfully negated the possibility that material facts remain undisclosed to this date").

Second, ratification has never been used in the manner that the Bankruptcy Court applied it. Ratification is virtually only raised as a defense to unauthorized trading and its purpose "is to require the customer to memorialize his complaint immediately after receipt of the account statement rather than waiting to see if the trade is profitable." *Modern Settings, Inc. v. Prudential-Bache Secs., Inc.*, 936 F.2d 640, 645-46 (2d Cir. 1991). Thus, the doctrine has no application in this case.

Third, we are unaware of a single case where a court has applied the doctrine of ratification against the victims of a fraudulent brokerage scheme. The Bankruptcy Court did not rely on ratification to prove that **real trades** were authorized – as is the context in which ratification is raised in virtually every case – but to prove that **fictitious trades** listed on **fictitious customer statements** necessarily generated **real withdrawals** that were received by a customer who disputes having any knowledge of those withdrawals and where there is no evidence of receipt. This is unprecedented. A customer cannot ratify fictitious transactions, and certainly not when the material facts are undisclosed. For example, ratification is virtually impossible to establish in churning cases because excessive trading "rarely lends itself to detection." *See Schindler v. Stockley*, 1985 WL 2338, at *5 (S.D.N.Y. Aug. 16, 1985), *aff'd,* 788 F.2d 3 (2d Cir. 1986). Similar reasoning precludes a finding of ratification here because Blecker could not possibly detect the material facts surrounding the fictitious transactions representing PWs.

The Madoff statements were specifically designed to mislead customers. The Bankruptcy Court held that Blecker should have understood the statements, apparently because he was a "successful [self-employed] CPA," but the Bankruptcy Court overlooked the indisputable fact that Madoff deceived scores of accountants, CFOs, SEC investigators, partners at Goldman Sachs, sovereign wealth funds, central banks, the NASDAQ, and numerous others whose knowledge of the securities industry far exceeded Blecker's. Blecker testified that he had "no way to prove whether . . . [his Madoff statements] w[ere] correct or not." Blecker Tr. at 14:14-20. The Trustee cannot explain how Blecker, in his 80s, should have detected Madoff's fraud in ten days when the SEC was unable to detect Madoff's fraud after seven investigations spanning a ten-year period.

Further, where the Madoff statements are virtually indecipherable, ratification cannot apply. *See Karlen v. Freidman & Co.*, 688 F.2d 1193, 1200 (8th Cir. 1982) ("[S]tatements do not

enable a customer to determine his or her overall position or the total amount of real profit or loss occurring, unless the customer is sufficiently skilled to elaborate upon them . . . . ."); *id.* (no ratification "[w]hen a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents"); *Evanston Bank v. Conticommodity Servs., Inc.*, 623 F. Supp. 1014, 1035 (N.D. Ill. 1985) ("Confirmation notices . . . are not necessarily readily analyzed by the average person."); *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1208 (9th Cir. 1970) (no ratification even though investor received accurate confirmations and statements for seven years, because she could not discern from the documents whether trading was excessive). Even though Blecker was a CPA, this does not mean he had the ability to comprehend every entry on customer statements intentionally designed to deceive. *See In re Thomson McKinnon Sec., Inc.*, 191 B.R. at 989 (even though customer understood general performance of account, customer did not ratify all transactions).

The Bankruptcy Court also cited the fact that Blecker's handwriting is found on ***one*** indecipherable Madoff statement dated February 25, 1995. *See* Order at 31 [AA413] (citing TX082). However, it is impossible for anyone to understand what that statement (or Blecker's notes) might mean, and this writing cannot ratify all 180 PWs. *See* TX082. Cryptic and intentionally misleading brokerage statements cannot form the basis of ratification, and Blecker's notes on one statement cannot ratify 180 separate PWs.

The Bankruptcy Court further held that Blecker ratified the PW transactions because he thought they represented purchases of securities for his accounts, which would be "debits or cash outflows," according to the Bankruptcy Court. Order at 34 [AA416]; *see also id.* at 32 [AA414]. This is a fallacy: if cash is debited to purchase a security, then the account is credited with the security and the economic effect of the transaction is cash-flow neutral. *See* Blecker Tr. at 14:14-

20 ("[I] assumed what they put on my statement must have been ***in*** my account.") (emphasis added). The Trustee put in no evidence to suggest that Blecker did not testify honestly concerning his understanding and it was not until after Blecker demanded to see copies of the alleged checks drawn on his account that the Trustee admitted the checks were not written to corporations; they were [allegedly] written to Blecker. ECF No. 14162-42.

Although the Bankruptcy Court gave ***one*** example of an instance where one of the 180 PW notations related to a security that was not listed on Blecker's statement the following month, Order at 44 [AA426], the Trustee failed to put into evidence the statements for succeeding months. Indeed, in total, only ***one*** set of consecutive monthly statements was put into evidence by the Trustee and that covered only two consecutive months. The Trustee concedes this issue on appeal.

Fourth, the Bankruptcy Court inappropriately relied on ratification to establish the precise question that this trial was designed to answer: whether Blecker received the PWs. Ratification is a legal question that cannot be established without first making the antecedent factual showing that Blecker received the PWs. *See Herman*, 592 F. Supp. at 1417-18 (ratification requires acceptance by the principal of the benefits of the agent's unauthorized act). Moreover, the Trustee did not prove that Blecker was advised of his right to reject the PWs. *See Merrill Lynch Pierce Fenner & Smith, Inc. v. Cheng*, 901 F.2d 1124, 1129 (D.C. Cir. 1990) (no ratification because customers "were not advised of their right to reject the unauthorized trades").

Here, the Bankruptcy Court sidestepped the very ***factual*** question at issue – whether Blecker received and accepted the PWs – and simply assumed he did by virtue of the ***legal*** doctrine of ratification. This was legal error, particularly here because there was pervasive dishonesty in Madoff's operation. If a purported PW check was given to Madoff or one of Madoff's many

dishonest employees, there is no basis to hold that Blecker could ratify this conduct from looking at his customer statements.

Fifth, in view of the evidence, it makes no sense to hold that Blecker was required to object to the PWs in writing and that he ratified the PWs by failing to do so. The Trustee does not have **any** writings from Blecker **requesting** PWs at the inception of his account or at any other time, even though Madoff testified that he would not send a customer a check without a written request. PCX Br. at 14-15. The Trustee does not have a letter from Blecker requesting that Madoff stop receiving PWs in 1997, even though there were no PWs on Blecker's statements after 1997 and it was Madoff's policy to require such writings. PCX Br. at 14-15. The absence of any writings from Blecker does not prove that he failed to object to the PWs, but rather that he never received PWs in the first place. *See* FRE 803(7).[4]

D. The cases cited by the Trustee do not support the Bankruptcy Court's unprecedented extension of the ratification doctrine

None of the cases cited by the Trustee would suggest that ratification applies here. In *In re Great E. Sec., Inc.*, *see* Trustee's Br. at 32, the claimant ratified the disputed stock purchase because he **admitted** that he knew his broker was going to make the purchase and he even instructed his broker, after the fact, **not to sell the stock** without consulting with him first. 2011 WL 1345152, at *7-8. In *In re Klein, Maus &Shire, Inc.*, 301 B.R. 408, 419-420 (2003), Trustee's Br. at 32, ratification applied because the claimants made several sales of the stock that was allegedly purchased without authorization as the price of the stock rose. *See id.* at 413, 419-420. Likewise, instead of requesting cancellation of the purchase, the claimants **admitted** that they intentionally waited to see how the alleged unauthorized trades would move before deciding to

---

[4]  To hold that Blecker ratified the PWs because he did not send a written objection would be illogical. The absence of any writings from Blecker requesting his account to be changed from an "S" to an "R" is dispositive in *disproving* the Trustee's case, not in proving it.

challenge them. *Id*. Moreover, the claimants demonstrated that they knew how to cancel an authorized trade because they had done so previously. *See id*. at 413, 419-20.

In *In re John Dawson & Associates, Inc.*, 289 B.R. 654 (Bankr. N.D. Ill. 2003), the court held that the claimant ratified unauthorized trades because he knew that the broker was making unauthorized trades; the claimant did not make a claim for the unauthorized trades that were profitable, and instead chose to make a claim only for the allegedly unauthorized trades that were not profitable; the claimant transferred $650,000 into his account even ***after*** acknowledging unauthorized trades on numerous occasions; and the 10-day language was contained on all of the trade confirmations. *See id*. Moreover, the claimant was a sophisticated investor with an MBA, had more than 25 years of investment experience, was president and majority shareholder of a company that was doing between $550 million and $1 billion in transactions per year as of 2003, and always invested through non-discretionary accounts, trading millions of dollars in his own accounts at various different institutions. *See id*. In Blecker's case, none of these facts was present and, of course, none of the customer statements contained the 10-day language. *See, e.g.*, *See* TX082.

The Trustee cites *Rosenman Family, LLC v. Picard*, 395 F. App'x 766 (2d Cir. 2010), but there the doctrine of ratification was not even raised. The court did not hold that the claimant was bound by the alleged trade.

E.  Blecker did not ratify the pre-1992 trades by his conduct

Although the Bankruptcy Court did not hold this, the Trustee argues that even in the absence of a customer agreement, a claimant can be bound by unauthorized trades. *See* Trustee's Br. at 32. However, this argument fails for the numerous reasons stated above and because it relies on completely inapposite cases.

The Trustee relies on *Altschul v. Paine, Webber, Jackson & Curtis, Inc.*, 518 F. Supp. 591, 594 (S.D.N.Y. 1981), Trustee's Br. at 32, but there the court dismissed the investor's claims for unsuitability and churning on numerous grounds, one of which was ratification. The investor knew the broker was making the disputed trades because he directed them, and the broker was the investor's own son and agent. *Id*. at 594-95.

The Trustee also relies on *Jaksich v. Thomson McKinnon Sec., Inc.*, 582 F. Supp. 485, 497 (S.D.N.Y. 1984), Trustee's Br. at 32-33, which held that the investor ratified transactions because her "knowledge of the wrong combined with her failure to object when the stock prices rose demonstrate her lack of innocence and her waiver of the Rule 10b–5 claim." Finally, the Trustee relies upon *In re: MF Glob. Inc.*, 2016 WL 270180 (Bankr. S.D.N.Y. Jan. 15, 2016), *see* Trustee's Br. at 33, but that case was not about implied ratification. In that case, the investor **expressly** ratified the transaction both verbally and in writing. 2016 WL 270180, at *9.

F.  The doctrine of *in pari delicto* and Section 29(b) of the Exchange Act bar the Trustee from relying on the 10-day provision

The Trustee argues that the doctrine of *in pari delicto* does not bar the Trustee from enforcing the 10-day provision against the customers whom Madoff defrauded, because, according to the Trustee, the doctrine "is not intended to be used offensively to sustain a claim." Trustee's Br. at 35. However, the Trustee has conceded that ratification is an affirmative defense, Trustee's Br. at 35, and it is the Trustee's burden to prove his affirmative defenses.

The Trustee, argues, in a footnote, that Section 29(b) of the Exchange Act does not apply because it permits only illegal contracts to be rescinded and the 1992 Customer Agreements were not illegal. Trustee's Br. at 35, n.11. This argument is incorrect because Section 29(b) prevents the Trustee from enforcing a provision in a fraudulently induced contract against the person whom Madoff defrauded. *See* PCX Br. at 51-52. Section 29(b) does not permit Madoff to rely on a

contractual ratification provision to selectively enforce fictitious transactions against a defrauded customer when the contract was executed with a view towards continuing an ongoing fraud. *See Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *4 (S.D.N.Y. Aug. 7, 2014) (Section 29(b) prevents enforcement of anything constituting a violation of the securities laws).

IV.    <u>To the extent Blecker was required to prove that he did not receive the 180 PWs, he met that burden</u>

A.   <u>The only admissible evidence clearly established that Blecker never received the 180 PWs</u>

Having failed to introduce any admissible evidence, the Trustee fails to rebut Blecker's showing that his Net Equity was $577,350. The evidence was overwhelming that Blecker never received a PW. *See* PCX Br. at 10-21. Although the Trustee now makes the argument that it was Blecker's burden to produce "bank records," "tax returns" and "other documents to support []his claim," Trustee's Br. at 29, no such records existed and Blecker produced everything he had. *See* PCX Br. at 13-14. There is no rule of law requiring a person to retain bank records or tax returns going back 21–37 years!

B.   <u>Blecker did not waive his argument that the absence of any third-party records in the BLMIS files conclusively proves his case</u>

The Trustee argues that Blecker waived the argument that the absence of any writing in Madoff's files from Blecker requesting withdrawals, or requesting to stop receiving withdrawals, is evidence that Blecker did not receive withdrawals under FRE 803(7). Trustee's Br. at 43-44. However, in countless instances below, Participating Claimants properly preserved this argument. *See, e.g.*, ECF No. 17398, ¶¶ 9, 24, 25-29, 35-39, 42-44, 59-54, 56, 60, 65, 66-68, 79, 83, 86, 117, 166-67, 171-72, 185.

C.   <u>The Trustee fails his own test</u>

The Trustee argues that Blecker withdrew all of his profits and received them automatically. According to the Trustee, this is why two of Blecker's Accounts, 1B0022 and

1B0157, did not appreciate from 1986-1997 as much as one might except if Madoff was a good investment. *See* Trustee's Br. at 19. The Bankruptcy Court accepted this argument to discount Blecker's testimony because Blecker had previously told Robert that Madoff was a good investment. But this misses key points: if there was **any increase** in value whatsoever between 1986 and 1997 then this means that the Trustee's theory – that Blecker would receive **all profits automatically –** is disproven.

Moreover, by having failed to produce and put into evidence all of the statements for **all** of the Blecker Accounts from 1981–2008, the Trustee has failed in his essential proof. PCX Br. at 10-11, 17-19. The Principal Balance Calculations fail to provide a full or accurate history of the Blecker Accounts and they simply summarize, from a mass of inadmissible hearsay, selective aspects of fictitious transactions. Collura admitted that she could not reconcile the Blecker Accounts. *See* PCX Br. at 15-17. And Madoff has no copies of checks to Blecker even though, if Blecker ever requested or received a check for a PW, Madoff "would still have a copy of it." *See* PCX Br. at 12-15. The Trustee's failure to put in any documentary evidencing proving that Blecker received a single check from Madoff compels the allowance of Blecker's full claim.

<u>**CONCLUSION**</u>

Based on the foregoing, the Bankruptcy Court's decision should be reversed and this Court should hold that: (1) the FRE apply in SIPA liquidations; (2) Greenblatt's testimony and his Principal Balance Calculations are inadmissible; (3) the Trustee adduced no admissible evidence that Blecker received PWs; (4) Blecker did not ratify any PWs; and (5) the Blecker Claims are allowed, in full, plus pre-judgment interest, to be paid within ten days of the entry of this decision.

January 17, 2019                                        **CHAITMAN LLP**

                                              By:   */s/ Helen Davis Chaitman*
                                                    Helen Davis Chaitman
                                                    Lance Gotthoffer
                                                    Gregory M. Dexter
                                                    465 Park Avenue
                                                    New York, New York 10022
                                                    (888) 759-1114
                                                    hchaitman@chaitmanllp.com
                                                    lgotthoffer@chaitmanllp.com
                                                    gdexter@chaitmanllp.com
                                                    *Attorneys for Aaron Blecker and*
                                                    *Participating Claimants Highlighted on*
                                                    *Exhibit A on the Joint Notice of Appeal*

## CERTIFICATE OF COMPLIANCE WITH RULE 8015(a)(7)(B)

Pursuant to Rule 8015(a)(7)(C) of the Federal Rules of Bankruptcy Procedure, the foregoing brief complies with Rules 8015(a)(7)(B)(i)-(ii) of the Federal Rules of Bankruptcy Procedure, and Your Honor's January 16, 2019 endorsement of Participating Claimants' January 15, 2019 letter requesting, with consent of all parties, permission to file a reply brief not exceeding 11,000 words.

The word count is 10,943.

January 17, 2019

**CHAITMAN LLP**

By: */s/ Helen Davis Chaitman*
Helen Davis Chaitman
Lance Gotthoffer
Gregory M. Dexter
465 Park Avenue
New York, New York 10022
(888) 759-1114
hchaitman@chaitmanllp.com
lgotthoffer@chaitmanllp.com
gdexter@chaitmanllp.com

*Attorneys for Aaron Blecker and*
*Participating Claimants Highlighted on*
*Exhibit A on the Joint Notice of Appeal*